Steven **SHELTON**, Defendant
Below, Appellant,

v.

**STATE** of Delaware, Plaintiff
Below, Appellee.

No. 31, 1998.

Supreme Court of Delaware.

Submitted: Jan. 27, 1999.
Decided: June 25, 1999.
Revised: Jan. 5, 2000.
Rehearing denied Jan. 5, 2000.

---

Michael W. Modica, Wilmington, Delaware, for Appellant.

Timothy J. Donovan, Jr., and William E. Molchen (argued), Deputy Attorneys General, Department of Justice, Wilmington, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, HARTNETT and BERGER, Justices, constituting the Court en Banc.

## O R D E R

This 5th day of January, 2000, it appears to the Court that:

(1) On July 6, 1999, appellant filed a motion for reargument, pursuant to Supreme Court Rule 18, of this Court's Opinion dated June 25, 1999.

(2) On July 23, 1999, the State filed an answer to the motion for reargument.

(3) The majority of the Court has determined that the motion for reargument should be denied. Justice Hartnett and Justice Berger would grant reargument.

(4) The Court has determined that the majority opinion and the dissent released on June 25, 1999 should be revised.

NOW, THEREFORE, IT IS ORDERED as follows:

(A) The motion for reargument is **DENIED.**

(B) The Opinion of the Court dated June 25, 1999 is revised with certain changes now found on pages 488, 495–496 and 498 of the revised opinion. The dissent is also revised.

(C) A revised opinion is filed contemporaneously with this Order.

VEASEY, Chief Justice, for the majority:

This appeal is from the trial court's decision and order denying postconviction relief in a case where the defendant was sentenced to death. The defendant asserts numerous claims centering around the basic argument that he was the victim of ineffective assistance of counsel at trial and on the direct appeal. One of his principal challenges in that context is the trial court's ruling that limited his right of allocution in addressing the jury at the penalty phase. This presents a question of first impression and obliges us to explore in some detail the history and modern developments in the law of allocution. We conclude that the trial court committed no error in rejecting all of the defendant's contentions and, therefore, we affirm.[1]

Defendant below-appellant Steven Shelton appeals from the Superior Court's denial of all the claims raised in his motion for postconviction relief, filed pursuant to Superior Court Criminal Rule 61. In 1993, Shelton and his two codefendants, Nelson Shelton and Jack Foster Outten, Jr., were convicted of the first degree felony murder of Wilson Mannon. All three defendants were sentenced to death in connection with the convictions. Nelson Shelton was executed on March 17, 1995.

With respect to Steven Shelton, the jury voted 8–4 that the aggravating circumstances outweighed the mitigating circumstances. We upheld his conviction on direct appeal,[2] in which he had claimed, among other claims, that the Superior Court erred by failing to sever the trials. That claim was rejected.[3]

Shelton's motion for postconviction relief in the trial court raised a number of claims that he contends justify the reversal of his convictions and sentence of death and require a new trial, a new penalty hearing, or both. Shelton's claims are as follows: (1) numerous defects existed with regard

---

**1.** Shelton was convicted in 1993 of two counts of first degree murder, first degree conspiracy, first degree robbery, and possession of a deadly weapon during the commission of a felony. After a penalty hearing, the jury recommended by an 8–4 vote a sentence of death for Shelton on each count of murder first degree. The conviction was affirmed by this Court. *See Outten v. State,* Del.Supr., 650 A.2d 1291 (1994) ("*Shelton I*"). Shelton appealed to the United States Supreme Court, which denied *certiorari. Shelton v. Delaware,* 515 U.S. 1145, 115 S.Ct. 2585, 132 L.Ed.2d 834 (1995). Subsequently, Shelton filed this motion for postconviction relief in the Superior Court which was denied as to all claims. *See State v. Outten,* Del.Super., Cr. A. Nos. IN–92–01–1144 to 1148; IN–92–01–1154 to 1158, 1997 WL 855718 (Dec. 22, 1997) (Mem. Op.) ("*Shelton II*"). From this denial of postconviction relief, Shelton appeals.

**2.** *Shelton I,* 650 A.2d 1291.

**3.** *See id.* at 1298.

to the testimony of Christine Gibbons, the State's main witness against Shelton; (2) trial counsel was ineffective in failing to prevent and to object timely to the testimony of Lisa Bedwell, who commented on the stand that Shelton had been in prison; (3) Shelton was prejudiced by a joint penalty hearing with Nelson and Outten and that counsel rendered ineffective assistance in failing to move to sever the hearing and to raise adequately the issue on direct appeal; (4) the court erred in limiting Shelton's right to allocution and that counsel was ineffective in failing to object to the court's limitation at trial and on direct appeal; (5) during the penalty hearing the prosecutor made an improper comment concerning Shelton's failure to express remorse in allocution, that trial counsel was ineffective in failing to raise the issue and to request a curative instruction and that appellate counsel was ineffective in failing to raise the issue on appeal; (6) trial counsel rendered ineffective assistance in the penalty phase by failing to prepare for the penalty hearing and to investigate adequately mitigating evidence, by failing to have Shelton examined by a psychiatrist and to present such findings at the penalty hearing, and by failing to present to the jury school and Family Court records containing mitigating evidence; and (7) the Superior Court abused its discretion in dismissing Shelton's motion for postconviction relief without granting an evidentiary hearing. The trial court rejected all of Shelton's claims, holding that they were either procedurally barred or without merit.

Shelton contends that the Superior Court either erred as a matter of law or abused its discretion in denying the relief requested in connection with the seven claims stated above. We agree with the well-reasoned decision of the Superior Court, and hold that the Superior Court neither erred as a matter of law nor abused its discretion.

## I. *Facts*

A full statement of the facts relevant to the instant appeal is contained in *Shelton I*[4] and *Shelton II*.[5] Only a brief summary is necessary for purposes of this appeal.

On January 11, 1992, Outten, Nelson and Steven Shelton, and Christine Gibbons, spent the day drinking heavily at various locations. Nelson and Steven Shelton were brothers. Outten was their cousin. Gibbons was Nelson's girlfriend. Their last stop brought the group to a bar they called the "Green Door." While inside, Gibbons struck up a conversation with the victim, Wilson Mannon, at the bar. Mannon bought Gibbons drinks and the two danced.

After last call at 1:00 a.m., Mannon, Outten, Gibbons, and the Sheltons left the Green Door. Nelson drove them in his car to an isolated street in Wilmington where the three defendants pulled Mannon from the car and beat him severely. These beatings caused Mannon's death. Over the course of the investigation and trial, Gibbons gave multiple accounts of what occurred that night.

Gibbons initially testified as follows: Nelson and Outten stepped out of the car and either they pulled Mannon out or he came out on his own. Steven went behind the car to be sick. Outten and Nelson then began punching Mannon in the face. Nelson retrieved a ballpeen hammer from the trunk of his car and hit Mannon in the back of the head, causing him to fall. Nelson told Outten to "finish it." Outten then picked up an object that Gibbons described as a sink and struck Mannon ten or more times between his nose and the top of his head, crushing his skull. After Outten finished, Steven returned and asked what had happened. Steven nudged Mannon's

**4.** Del.Supr., 650 A.2d 1291 (1994), *cert. denied*, 515 U.S. 1145, 115 S.Ct. 2585, 132 L.Ed.2d 834 (1995).

**5.** Del.Super., Cr. A. Nos. IN–92–01–1144 to 1148; IN–92–01–1154 to 1158, 1997 WL 855718 (Dec. 22, 1997) (Mem.Op.).

body. All three defendants then passed around Mannon's wallet and robbed him of his money and jewelry.

After her initial testimony, Gibbons requested to retake the stand because she had lied during her previous testimony. The court permitted her to recant any prior testimony. Gibbons' new testimony was essentially the same, except she directly implicated Steven in the beating. This time, Gibbons testified she saw Steven with the hammer. She said she saw Steven kick and punch Mannon many times in the face. According to Gibbons, all three defendants went through Mannon's pockets and touched his wallet and jewelry. Gibbons believed Steven took Mannon's necklace.

Gibbons testified that Steven told her to say he had gone off into the woods at the time of the murder. Gibbons stated that she earlier had given different versions of the story because she was confused. Gibbons also explained that it would not be fair just blaming Nelson and Outten when Steven also had a part in the murder.

In addition to Gibbons' testimony, the forensic and other physical evidence implicated Steven in the murder. After a jury trial, the court convicted and sentenced all three defendants to death.

The additional facts pertinent to this appeal relate to the details concerning Gibbons' testimony and the events at trial. These facts and other facts relating to Steven's trial theories, postconviction theories, and the effectiveness of trial counsel are developed hereinafter under the individual headings of Steven's contentions to which they relate.

## II. The Alleged Defects Surrounding the Testimony of Christine Gibbons.

Shelton argues that the Superior Court denied him a fair trial because the State engaged in misconduct by threatening and intimidating Gibbons to retake the stand and recant portions of her testimony. He also alleges that his constitutional right of confrontation was violated when he was denied the opportunity to cross-examine Gibbons, the prosecutors, Gibbons' attorney and Detective William Brown to explore the circumstances surrounding the recall of Gibbons and her subsequent recantation. Shelton couches these two arguments in a claim for ineffective assistance of counsel. Finally, he argues he was denied his due process right to a fair trial because Gibbons was intoxicated during part of her testimony.

### (a) Prosecutorial Misconduct

Shelton argues that the prosecutors improperly threatened and intimidated Gibbons into recanting parts of her previous testimony and implicating Shelton in Mannon's murder. Trial counsel failed to raise a specific objection to this issue at trial. Shelton now argues that counsel was ineffective in failing to object to Gibbons' testimony when the State recalled her to the stand and in failing to raise the issue of prosecutorial intimidation. He also claims appellate counsel was ineffective in failing to raise this issue on direct appeal.

This Court reviews for abuse of discretion the Superior Court's decision on an application for postconviction relief.[6] Questions of law are reviewed de novo.[7]

Trial counsel did not render ineffective assistance by failing to object to the issue of prosecutorial intimidation. When reviewing a motion for postconviction relief under Superior Court Criminal Rule 61, this Court must first consider the procedural requirements of the rule before giving consideration to the merits of the underlying claim.[8] Because trial counsel

---

6. See Dawson v. State, Del.Supr., 673 A.2d 1186, 1190 (1996); Bailey v. State, Del.Supr., 588 A.2d 1121, 1124 (1991).

7. See Dawson, 673 A.2d at 1190; E.I. duPont de Nemours & Co., Inc. v. Shell Oil Co., Del. Supr., 498 A.2d 1108, 1113 (1985).

8. See Flamer v. State, Del.Supr., 585 A.2d 736, 747 (1990) (citing Harris v. Reed, 489 U.S.

failed to object to Gibbons' testimony at trial and the issue was not raised on direct appeal, Superior Court Criminal Rule 61(i)(3) procedurally bars Shelton's post-conviction appeal unless Shelton can establish: (1) cause for his procedural default, and (2) actual prejudice resulting from the failure to assert the claim.[9] If "counsel's failure to pursue a reasonably available claim is so egregious as to constitute ineffective assistance under the Sixth Amendment ...," that failure may be cause to excuse the procedural default and reverse the prior conviction.[10] Attorney error which falls short of ineffective assistance of counsel does not constitute cause for relief from a procedural default.[11]

▮▮▮ In an attempt to establish cause for his procedural default, Shelton argues that trial counsel was ineffective in failing to object to Gibbons' testimony when she was recalled to the stand and in failing to investigate adequately the issue of prosecutorial intimidation. Because Shelton did not raise the intimidation issue at trial nor on appeal, he must now prove that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) that counsel's actions were prejudicial to his defense, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[12] The prejudice prong of the *Strickland* standard requires "attention to whether the result of the proceeding was fundamentally unfair or unreliable."[13] There is a strong presumption that defense counsel's conduct constituted sound trial strategy.[14] Further, a defendant "must make specific allegations of actual prejudice and substantiate them."[15] Upon review of the facts of record and the arguments presented, it is clear that Shelton can not make a showing sufficient to meet either prong of the *Strickland* test.

Shelton must show how trial counsel's failure to object to Gibbons' retaking the stand indicates that counsel's representation fell below an objective standard of reasonableness. In order to determine whether he has met this burden, we must first determine whether grounds exist for his claim of prosecutorial misconduct.

▮▮▮ We conclude that the prosecutors did not engage in misconduct with regard to Gibbons' testimony. Moreover, any inference of impropriety nonetheless was explored adequately by trial counsel and the court below. Because Shelton's claim for prosecutorial misconduct is without merit, he is unable to prove that counsel rendered ineffective assistance in failing to object.

The Superior Court and counsel adequately explored the circumstances of Gibbons' recantation and new story implicating Shelton in the murder. Before her return to the witness stand on February 4, 1993, the Superior Court offered defense counsel an opportunity to question Gibbons outside the presence of the jury about the circumstances of her return and recanta-

255, 265, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)).

9. *See* Super. Ct.Crim. R. 61(i)(3); *see also Dawson*, 673 A.2d at 1190; *Younger v. State*, Del.Supr., 580 A.2d 552, 555–56 (1990).

10. *Flamer*, 585 A.2d at 758; *see Younger*, 580 A.2d at 556.

11. *See Flamer*, 585 A.2d at 758; *Younger*, 580 A.2d at 556.

12. *Flamer*, 585 A.2d at 753 (citing *Albury v. State*, Del.Supr., 551 A.2d 53, 58 (1988)) (setting forth the standard from *Strickland v.*

*Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

13. *Outten v. State*, Del.Supr., 720 A.2d 547, 552 (1998) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)).

14. *See Flamer*, 585 A.2d at 753 (citing *Albury*, 551 A.2d at 59; *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

15. *Wright v. State*, Del.Supr., 671 A.2d 1353, 1356 (1996) (citing *Younger*, 580 A.2d at 555–56).

tion. Both Outten and Shelton's counsel questioned her. On the motion for post-conviction relief, the court determined:

> Their questioning covered who had contacted her the night before she was then testifying, *whether there [were] threats by the prosecutors*, what was discussed the previous night, conversations with her lawyer, risks of a perjury charge, her flight from the courthouse around thirty minutes before she was being asked these questions and so forth.[16]

Upon her return to the witness stand on February 4, 1993, Gibbons testified at length about the chronology of events leading to her return and her motivation for returning. Never once did Gibbons indicate that the State had threatened or coerced her recantation, or otherwise engaged in prosecutorial misconduct. The sequence of events surrounding Gibbons' recantation was as follows.

Gibbons initially testified on the witness stand from January 21, 1993 to January 28, 1993. During her testimony, Gibbons' account of the night of the murder tended to exculpate Shelton in Mannon's death. After her testimony on January 28, Gibbons indicated to her lawyer "that she may have more to say, and that she wanted to talk to the State."[17] The lawyer relayed that information to the prosecutor.

On February 3, 1993, the prosecutor called Gibbons to schedule a meeting and told Gibbons that "we need to talk," but would say nothing more until Gibbons' attorney was present.[18] Gibbons testified that during that call, no one from the State threatened Gibbons or indicated that they believed she had committed perjury. On February 4, 1993, Gibbons called the prosecutors and told them she wanted to change her story. That afternoon, Gibbons and her lawyer discussed her changing her story. Gibbons knew that she had lied repeatedly, and thus was afraid of being charged with perjury or that she would be charged with the murder because she helped lure Mannon out of the bar. Her lawyer advised Gibbons that if she retook the stand and testified truthfully, she would have a defense if subsequently charged with perjury.

Thereafter, with her lawyer present, Gibbons informed the State that she needed to change her testimony because "there's something I need to say."[19] But before she appeared in court to retake the stand, Gibbons ran from the courthouse. She was stopped and placed under surveillance until she retook the witness stand.

When Gibbons retook the stand, she testified that "Steve [Shelton] was involved" and that "I saw all three of them do it."[20] Gibbons explained that she had returned because she had lied on the stand.[21] Gibbons later testified that she returned to the stand because "I lied numerous times and that I did want to straighten it all out. I just wanted to come clean."[22]

During Gibbons' recantation, she testified that on the night of the murder Steven punched and kicked Mannon repeatedly "from his waist up" and "in the face a couple of times."[23] Gibbons also testified that Steven said "finish it" to Nelson and Outten.[24]

With regard to her new testimony, Gibbons stated that Outten and Shelton had asked her to change her story before she initially had testified. Gibbons also testified that she feared the Sheltons and Outten. Never once did Gibbons indicate on

16. *Shelton II*, Mem. Op. at 69 (emphasis added).

17. Tr. at 179–80 (Feb. 4, 1993).

18. Tr. at 158 (Feb. 4, 1993).

19. Tr. at 160 (Feb. 4, 1993).

20. Tr. at 161–62 (Feb. 4, 1993).

21. Tr. at 168–69 (Feb. 4, 1993).

22. Tr. at 133 (Feb. 12, 1993).

23. Tr. at 21–22 (Feb. 12, 1993).

24. Tr. at 24, 107 (Feb. 12, 1993).

the stand that the State had coerced her recantation by threatening her with perjury or any other criminal charge. Gibbons also testified that the prosecution never promised her anything in return for her recanted testimony. Thus, we find that insufficient evidence exists in the record to support a claim of prosecutorial misconduct.

Shelton argues that Gibbons' alleged statements to investigator Carl Kent in April 1996 indicate that Gibbons was pressured into changing her testimony. According to the Kent reports, the prosecutors repeatedly told Gibbons "they wanted all three, not just Nelson and Jack," and they threatened her with "[p]erjury if she did not testify to what she had previously told them." [25] Gibbons also told Kent she "had no [choice] but to implicate all three to keep myself from going to jail." [26] She stated that she felt "if she didn't do what they wanted, I would go to and stay in jail." [27] In the Kent reports, Gibbons also expressed that she felt pressure from threats allegedly made by the Shelton family on her life and her property.

■ The Superior Court held that the Kent reports presented "insufficient new information to warrant a hearing on the circumstances of Gibbons' return," finding that "[m]uch of what she reports was known to the jury and even more was known to Steven's counsel based on what she said outside the jury's presence." [28] We agree with the conclusion of the Superior Court. The Kent reports present no new evidence of prosecutorial misconduct because Gibbons' statements in 1996 add

little to what she expressed in 1993 and what then was considered at trial.

Shelton correctly points out that in light of Gibbons' repeated inconsistent statements, it is reasonable to assume that Gibbons feared she would be charged with perjury or murder if she did not "come clean." It is also likely that Gibbons felt an underlying pressure from the State to testify truthfully. Furthermore, Gibbons knew that if she retook the stand, she would have a defense to any subsequent prosecution.

■ But these fears expressed by Gibbons are not indicative of a pattern of misconduct on the part of the prosecution. Even if Gibbons reasonably did believe that the State was threatening her with perjury, this is not reversible error under the circumstances.[29] In most cases, merely warning a defendant of the consequences of perjury is not reversible.[30]

Most importantly, Gibbons' statements and the events leading up to her recantation in no way should have alerted defense counsel that the State had "substantially interfered with any free and unhampered determination the witness might have made as to whether to testify and if so as to the content of such testimony." [31] After discussing the situation with Gibbons before her February 4, 1993 recantation, defense counsel was fully aware that it was Gibbons' own will, and not the prosecution's threats or intimidation, that had inspired Gibbons to change her testimony.

In addition, we are persuaded that trial counsel acted reasonably by the fact that on February 4, 1993, Steven's counsel joined Nelson and Outten's counsel in re-

---

**25.** Investigative Rpt. by Carl B. Kent, at 7 (April 1996).

**26.** *Id.* at 9.

**27.** *Id.*

**28.** *Shelton II*, Mem. Op. at 73.

**29.** *See United States v. Smith*, 10th Cir., 997 F.2d 674, 680 (1993) (holding it was no threat

for prosecutor to advise witness who was telling two stories that he might be prosecuted for perjury).

**30.** *See id.*

**31.** *United States v. Thomas*, 6th Cir., 488 F.2d 334, 336 (1973) (holding misconduct by government directly produced opportunity for jury to draw prejudicial influences from fact that witness failed to testify).

questing a mistrial on the ground that Gibbons was an incompetent witness.[32] The Superior Court denied the request for a mistrial and this Court affirmed the decision on appeal.[33]

The prosecutors did not engage in misconduct with regard to the testimony of Christine Gibbons. Accordingly, we find that both trial counsel and the Superior Court adequately explored the circumstances leading up to Gibbons' recantation. The jury had Gibbons' two stories in front of it and carried out its duty in determining which version was most credible.[34] Because trial counsel did not act unreasonably with regard to the alleged prosecutorial misconduct, appellate counsel cannot be faulted for failing to raise the issue on appeal. Shelton, therefore, has failed to show cause for his procedural default under Superior Court Criminal Rule 61(i)(3). Because he has failed to show cause for his procedural default, this Court need not consider whether Shelton can demonstrate prejudice.[35]

### (b) Failure to Cross–Examine Lawyers Involved in Gibbons' Recantation

Shelton makes the related claim that defense counsel rendered ineffective assistance in failing to object to the statements made by the individuals involved in the circumstances leading up to Gibbons' recantation. Shelton argues that he should have been afforded the opportunity to cross-examine all individuals directly involved in the recantation. He also argues that because of the self-interested nature of the lawyers' comments to the trial court, defense counsel should have objected to their unsworn testimony and requested to cross-examine the lawyers. Shelton also contends that appellate counsel was deficient for failing to raise the issue on appeal. According to Shelton, defense counsel's failure to protect his right to confrontation establishes cause for his procedural default under Superior Court Criminal Rule 61(i)(3).

As discussed above in II(a) of this Opinion, after Gibbons' initial recantation, the prosecutors and Gibbons' lawyer recited to the court the events leading up to Gibbons' recantation. Shelton's lawyer did not object to their discussion or request that he be permitted to cross-examine the lawyers' statements.

 Shelton's claim that trial counsel's alleged ineffectiveness denied him the right to confrontation is unpersuasive. Here, Shelton essentially is arguing that the prosecutors and Gibbons' lawyer did not speak candidly or truthfully to the court.[36] While the Confrontation Clause does protect the right of a defendant in a criminal case to conduct cross-examination of witnesses against him,[37] "[a] defendant has no right to confront a witness who does not provide any evidence at trial."[38]

---

**32.** Tr. at 124 (Feb. 4, 1993).

**33.** See Shelton I, 650 A.2d at 1295–96 (holding that despite Gibbons' inconsistent statements, "[c]ompletely striking Gibbons' testimony would have been excessive, and the trial court's decision not to declare a mistrial was not an abuse of discretion").

**34.** See Conlow v. State, Del.Supr., 441 A.2d 638, 640 (1982) (holding no error in trial court's conclusion that obvious inconsistencies in State's case did not rise to level of perjury but presented question of credibility for jury).

**35.** See Flamer, 585 A.2d at 747–48.

**36.** See Rule 3.3 of The Delaware Lawyers' Rules of Professional Conduct, which pro- vides that "(a) a lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal." D.L.R.P.C. R. 3.3.

**37.** See Delaware v. Fensterer, 474 U.S. 15, 18– 19, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (citing California v. Green, 399 U.S. 149, 157, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)).

**38.** People v. Gearns, 457 Mich. 170, 577 N.W.2d 422, 430 (1998) (citing People v. Scheidt, 182 Colo. 374, 513 P.2d 446 (1973)); United States v. Porter, 1st Cir., 764 F.2d 1, 9– 10 (1985) (holding Confrontation Clause does not come into play where a potential witness neither testifies nor provides evidence at trial).

Here, the prosecutors and Gibbons' lawyer were not witnesses against Shelton as they did not provide any evidence against him.[39] Rather, the lawyers merely advised the court that Gibbons had initiated contact with her lawyer and the State, explaining that Gibbons sought to recant her testimony. Thus, because Shelton had no right to cross-examine the lawyers, counsel was not deficient in failing to raise the issue.

■ In the alternative, even if the lawyers' statements to the court were considered evidence against Shelton, trial counsel made a well-reasoned strategic decision not to cross-examine the lawyers. Questioning the lawyers on the stand would only corroborate Gibbons' testimony further, as the lawyers would tell the jury the same incriminating story that Gibbons had provided during her recantation. That is, the lawyers would testify on cross-examination that Gibbons told them she had lied when she initially testified that Steven was not involved. Therefore, because questioning the lawyers on the stand only would have hurt Shelton, he is unable to prove that he was prejudiced by defense counsel's decision.

■ Moreover, Shelton's trial counsel acted reasonably in forgoing the opportunity to cross-examine the lawyers. "Whether to call a witness, and how to cross-examine those who are called are tactical decisions."[40] So long as the decision to cross-examine is made reasonably, it will not constitute a basis for a claim of ineffective assistance of counsel.[41] We agree with the Superior Court that defense counsel's decision not to pursue cross-examination was reasonable.

In short, Steven's counsel realized that to question Gibbons' lawyer and the prosecutors about the reasons for her return would only further harm his case. Even if he did not realize it at trial, he should not be criticized now for that lack of realization. To question these lawyers in front of the jury would only have repeated what Gibbons was now saying: Steven participated in Mannon's murder. To not question avoided that evil. To question them may have constituted ineffective assistance. Under these circumstances, it cannot be said trial counsel was ineffective. On that ground, this claim lacks merit.[42]

Trial counsel's decision was calculated and well reasoned because counsel considered the damage that might have resulted had he cross-examined the lawyers. Accordingly, counsel's decision will not constitute a basis for a claim of ineffective assistance of counsel.

Because he cannot prove that counsel was ineffective, Shelton has failed to establish cause for his procedural default under Superior Court Criminal Rule 61(i)(3).[43] Shelton also has failed to prove that he was prejudiced by counsel's omission. Therefore, Superior Court Criminal Rule 61(i)(3) bars relief on Shelton's claim for ineffective assistance of counsel.

### (c) Gibbons' Alleged Intoxication on the Stand

Shelton argues that he was denied the due process right to a fair trial because Gibbons was intoxicated on the stand during a portion of her testimony. Shelton failed to raise the issue of Gibbons' alleged intoxication at trial and on direct appeal. Shelton claims that the cause for his proce-

---

39. *See Gearns,* 577 N.W.2d at 430 (holding that in order for right to confrontation to arise, some substantive testimony or its equivalent must first occur).

40. *Outten,* 720 A.2d at 557 (citing *United States v. Lively,* D. Del., 817 F.Supp. 453, 462, aff'd, 3d Cir., 14 F.3d 50 (1993)); *see United States v. Nersesian,* 2d Cir., 824 F.2d 1294, 1321 (1987) (holding that decisions whether

to cross-examine are strategic and will not constitute a basis for ineffective assistance of counsel).

41. *See id.*

42. *Shelton II,* Mem. Op. at 71.

43. *See Younger,* 580 A.2d at 556.

dural default under Superior Court Criminal Rule 61(i)(3) was that he did not know and reasonably could not have known of the factual predicate of this claim at the time of default at trial. Shelton contends that he "was prejudiced by Gibbons' failure to disclose her level of intoxication because the jury was misled by her sobriety, credibility, and the reliability of the evidence suggested by her testimony." [44]

In a post-trial interview with investigator Carl Kent, Gibbons for the first time alleged that she was under the influence of alcohol and/or drugs during the course of her initial statements to police and prosecutors and that she was intoxicated during her initial trial testimony.[45] Gibbons told Kent, however, that she was not intoxicated when she made her recantation.[46]

Kent also interviewed Laurie Shotwell, an acquaintance of Gibbons, who recalled going to a bar near the courthouse with Gibbons two to three times during Shelton's trial and drinking heavily.[47] According to Shotwell, Gibbons "sometimes got drunk rapidly," and that Gibbons was "tipsy," "not falling down drunk," when they drank on the trial dates.[48]

Generally, allegations of intoxication by a trial participant require a fact-finding hearing because individuals intoxicated at the time they are offered as witnesses are excluded from testifying.[49] In order to establish cause for his failure to request a hearing on Gibbons' sobriety, Shelton claims that at the time of trial he did not know and could not have known

that Gibbons was intoxicated. We are not persuaded by this argument because Shelton is unable to substantiate his claim that Gibbons was drinking nor can he show that he could not have known about Gibbons' alleged intoxication.

The court, defense counsel, Shelton, and Shelton's co-defendants all observed and interacted with Gibbons at trial. Never once did anyone in the courtroom express a concern that Gibbons might be intoxicated. Furthermore, Shelton knew Gibbons well enough that he could have raised the intoxication issue if she was acting oddly while on the stand. The Superior Court stated:

> The Court saw no evidence of alcohol consumption during the time Gibbons was testifying and free on unsecured bail. There was no breath or lingering aroma while Gibbons was but a few feet from the Court. The Court observed Gibbons' demeanor while testifying at the bail hearing, the two occasions she appeared at trial, her several days of video testimony and the videotape of her initial statements to the police. Probably more than most witnesses in most trials, Gibbons was observed at great length. Her demeanor could be easily compared.

Gibbons walked close to counsel in the case while approaching the witness stand, primarily Nelson's lawyer. Before she ultimately recanted, Nelson's counsel had more incentive than Steven's counsel to raise the question about

---

**44.** Appellant's Op. Br. at 33. Shelton does not appear to couch this contention in a claim for ineffective assistance of counsel. Rather, Shelton argues that he was denied a fair trial because Gibbons was intoxicated on the stand when she testified as to his involvement in the murder.

**45.** *See* Investigative Rpt. by Carl B. Kent, at 8, 10 (April 1996).

**46.** *See id.* at 10.

**47.** *See* Investigative Rpt. by Carl B. Kent, at 2–3 (May 13, 1996).

**48.** *See id.* at 4.

**49.** *See generally Massey v. State*, Del.Supr., 541 A.2d 1254, 1258 (1988) (citing *Estes v. Texas*, 381 U.S. 532, 542, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965)) (holding mere introduction of some evidence of juror ingesting alcohol or drugs is insufficient to warrant a presumption of prejudicial influence against a defendant); 81 Am.Jur.2d, Witnesses § 185 (1992).

whether Gibbons was drinking. All counsel, prosecutors and defense, are experienced counsel and are capable of detecting the signs of intoxication. They, too, along with their clients, had been at the bail hearing, the trial video deposition and the trial. Therefore, they had a clear benchmark to detect any change in Gibbons' demeanor suggestive of alcoholic or drug consumption. Nothing was raised. Further, Steven and Nelson knew Gibbons better and longer than counsel and the Court. Yet nothing in her January demeanor prompted them to alert their lawyers that Gibbons may have been drinking or consuming drugs.[50]

We defer to the Superior Court's observation that Gibbons exhibited no signs of intoxication while on the stand. Even if Gibbons were drinking, Shelton is unable to show the existence of unknown facts that precluded him from raising the intoxication issue at trial or on appeal.[51]

Even if we found that Shelton had established cause, Shelton would not be entitled to relief because he can not show actual prejudice from Gibbons' alleged intoxication. In the Kent reports, Gibbons claimed she was intoxicated during the second half of her first day's testimony.[52] But Gibbons also stated that she was not intoxicated on her second day in the courtroom, when she recanted her original story that had exculpated Steven.[53] Thus, when she implicated him in the murder, Gibbons was not intoxicated, with the result that he is unable to prove Gibbons' intoxication prejudiced him.

■ Accordingly, under Superior Court Criminal Rule 61(i)(3), Shelton is unable to show cause for his procedural default and is unable to prove that he was prejudiced by Gibbons' testimony because she was not intoxicated when she inculpated Shelton in the murder. Therefore, on that ground, we decline to overturn Shelton's conviction and death sentence.

## III. *Ineffective Assistance of Counsel with Regard to Lisa Bedwell's Comment that Shelton Had Been Incarcerated.*

Shelton argues that he was denied a fair trial because a defense witness, Lisa Bedwell, testified that Shelton previously had been incarcerated. According to Shelton, defense counsel rendered ineffective assistance by failing to move in limine to prevent Bedwell from testifying about Shelton's criminal past, and for failing to make a timely objection to Bedwell's statement. Shelton contends that despite the court's curative instruction, the inadmissible statement was a violation of D.R.E. 404 and deprived Shelton of his constitutional right to due process.[54]

Shelton failed to raise this issue at trial or on direct appeal. Therefore, Superior Court Criminal Rule 61(i)(3) bars relief unless Shelton can show cause for his procedural default and resulting prejudice.[55] He is unable to meet this burden.

Shelton's co-defendant, Jack Outten, called Lisa Bedwell for the apparent purpose of undermining the credibility of Christine Gibbons. Bedwell had known Gibbons for approximately nine years and the two were once friends. According to

---

50. *Shelton II,* Mem. Op. at 64–65.

51. *See Porter v. Singletary,* 11th Cir., 49 F.3d 1483, 1488 (1995) (holding fact that petitioner did not possess or reasonably could not have obtained evidence fails to establish cause if other known or discoverable evidence could have supported the claim).

52. Investigative Rpt. by Carl B. Kent, at 10 (April 1996).

53. *See id.*

54. D.R.E. 404(b) provides: "Other crimes, wrongs or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." D.R.E. 404(b).

55. *See* Super. Ct.Crim. R. 61(i)(3); *Dawson,* 673 A.2d at 1190.

Bedwell, Gibbons called her on the day of the murder and asked her to sell a stereo because Gibbons needed money. During the conversation, Gibbons provided Bedwell with multiple versions of the involvement and culpability of the individual co-defendants in Mannon's murder.

On cross-examination, the State sought to show that Bedwell was biased in favor of Steven Shelton. The State asked about Bedwell's relationship with Gibbons and with each of the defendants. The issue at bar arose out of the following colloquy between the prosecutor and Bedwell:

Q. How about Steve Shelton, do you know Steve Shelton, also?

A. I know him. I don't know him, you know. I met him a couple of times.

Q. You know him if you see him?

A. Yes.

Q. And about how long have you known Steve?

A. What did you ask me about Steve?

Q. How long, I mean, what period of time?

A. I don't even know. I can't—I don't know.

Q. A number of years, also?

A. No. Well, it was right after he got out of prison the last time.

The Court: That answer will be stricken and the jury is instructed quite clearly to disregard it.

[Shelton's Defense Counsel]: Can we come to sidebar? [56]

At sidebar, Shelton's lawyer moved for a mistrial.

Your honor, we tried—We have gone to great lengths at the risk of a mistrial because of trying all three of these men together to absolutely avoid that kind of thing. Now, there has been terrible prejudice done to my client and I do not believe that from now on he can get a fair trial in this case. Now we have a record of him being in prison with no information of any of the other individuals having been in prison and I clearly believe it's grounds for mistrial. I ask that my client be mistried out of this case. [57]

The Superior Court denied Shelton's motion for a mistrial. The court stated that the fact that the trial was held jointly was irrelevant and meaningless. The court indicated that the lawyers in the case needed to instruct the witnesses to "stay away from problem areas" when examining them on the stand. [58] Nevertheless, the court concluded that its "specific, clear, immediate instruction" cured any prejudice that might have resulted to Shelton. [59]

Immediately after the court's ruling, Shelton indicated that he wished to terminate his lawyer's representation. Shelton argued, and his trial counsel admitted, that during cross-examination, Shelton had warned trial counsel that Bedwell was about to say that she had known Shelton since prison. At that time, Shelton asked trial counsel to object to the State's line of questioning, but Bedwell made the statement about prison before trial counsel could stand and object.

Trial counsel informed the court that he was in the process of objecting on relevancy grounds when Bedwell blurted out the statement. Neither the prosecutor nor trial counsel had anticipated that Bedwell would make such a statement. The prosecutor informed the court:

I have been provided a *Jencks* statement from ... [Outten's lawyer] and it doesn't mention that she mentioned, he got out of jail. I never talked to this witness before today. I had no idea she was going to say that. And certainly, my question was an open-ended question.

**56.** Tr. at 86–87 (Feb. 16, 1993).

**57.** Tr. at 88 (Feb. 16, 1993).

**58.** Tr. at 89 (Feb. 16, 1993).

**59.** Tr. at 89 (Feb. 16, 1993).

It was as to bias, as to how long she had known Steven Shelton.[60]

Shelton's lawyer responded:

Again, your honor. It was a statement supplied by the State—I had no idea until my client whispered in my ear. I didn't really think it was going to happen, because I thought that she had been properly prompted.[61]

Shelton now argues that trial counsel should have made a "preemptive objection" in the form of a motion in limine to prevent Bedwell from testifying about Shelton's incarceration. Shelton also contends that trial counsel was deficient in failing to make a timely objection to Bedwell's testimony. We disagree.

First, the record shows that neither the State nor trial counsel had reason to anticipate that Bedwell would answer an innocuous question in the manner that she did. Bedwell's comment was a surprise to both sides. It came in response to the State's relevant inquiry on the issue of Bedwell's alleged bias in favor of Shelton. Therefore, the question was not objectionable and trial counsel had no cause to object at that point. Moreover, as soon as Shelton apprised trial counsel of the likelihood that Bedwell would mention prison, it was already too late. Bedwell blurted out her statement almost contemporaneously with Shelton's warning to trial counsel.

Second, Bedwell was Outten's witness whom Outten produced to impeach Gibbons' testimony. Any effort to undermine Gibbons, who by then had retaken the stand to implicate Shelton, was clearly in Shelton's best interest. Therefore, we are not persuaded by Shelton's argument that trial counsel should have moved in limine to silence a witness who was proffering testimony in Shelton's favor. This conclusion is bolstered by the fact that trial counsel had no indication that Bedwell would mention Shelton's stay in prison until it already was too late.

Third, Bedwell's comment was brief and did not involve the nature of the crime for which Shelton was incarcerated, nor the length of his stay. Therefore, the comment was only mildly prejudicial, if at all. Nevertheless, the Superior Court cured any prejudice that might have occurred by striking sua sponte the answer and instructing the jury to disregard the comment.[62] In a similar context, this Court held that "[p]rejudicial error will normally be cured by the trial judge's instructions to the jury."[63] Presumably, the jurors followed the court's instruction.[64]

■ Here, the cautionary instruction, because it was given immediately, sufficed to cure whatever prejudice may have occurred.[65] Under the circum-

---

**60.** Tr. at 100–01 (Feb. 16, 1993).

**61.** Tr. at 101 (Feb. 16, 1993).

**62.** *See Dawson v. State*, Del.Supr., 637 A.2d 57, 62 (1994) (holding no error where trial judge denied motion for mistrial when during penalty phase prison guard testifying blurted out "death sentence and escape risk").

**63.** *See id.* (citing *Sawyer v. State*, Del.Supr., 634 A.2d 377, 380 (1993); *Diaz v. State*, Del. Supr., 508 A.2d 861, 866 (1986)). *But see Weddington v. State*, Del.Supr., 545 A.2d 607, 614–15 (1988) (holding court's curative instruction was insufficient to remedy prosecutor's improper question involving race); *Bailey v. State*, Del.Supr., 521 A.2d 1069, 1077 (1987) (holding mistrial properly declared when witness mentioned defendant was in

prison for a life sentence for a previous conviction on the same charge).

**64.** *See id.; Claudio v. State*, Del.Supr., 585 A.2d 1278, 1280 (1991); *Kornbluth v. State*, Del.Supr., 580 A.2d 556, 560 (1990). *See also Floudiotis, et al. v. State*, Del.Supr., 726 A.2d 1196, 1206–07 (1999) (holding curative instruction usually suffices to make an inadvertent error harmless) (citing *Zimmerman v. State*, Del.Supr., 628 A.2d 62 (1993)).

**65.** *See Keperling v. State*, Del.Supr., 699 A.2d 317, 320 (1997) (finding no prejudice in admitting gruesome photographs of murder victim where court sua sponte gave a cautionary instruction about the purpose for which the photos were being displayed). *Cf.* D.R.E. 105; *Getz v. State*, Del.Supr., 538 A.2d 726, 734 (1988).

stances, Bedwell's statement did not warrant a mistrial, as a mistrial is mandated only when there are "no meaningful and practical alternatives" to that remedy.[66] Accordingly, we do not find that counsel rendered ineffective assistance in failing to make a motion in limine or to otherwise prevent the prejudicial testimony of Lisa Bedwell. Therefore, under Superior Court Criminal Rule 61(i)(3), Shelton is unable to show cause for his procedural default or that he was prejudiced by counsel's alleged deficiency.

## IV. Ineffective Assistance of Counsel in Failing to Move to Sever the Penalty Phase.

Shelton argues that trial counsel was ineffective in failing to move to sever the penalty hearing and that he was prejudiced by the joint hearing. Shelton also argues that appellate counsel was ineffective in failing to raise the issue on direct appeal. According to Shelton, "[e]ven though a motion to sever the trial was denied by the court, it did not address the severance issue in the context of the potential prejudice posed by a joint penalty phase hearing."[67] Shelton contends that a motion to sever a joint penalty phase hearing raises issues that would not be addressed in a motion to sever the guilt phase of the trial. Thus, according to Shelton, the only way effectively to avoid the prejudice of a joint penalty phase hearing was to sever the penalty phase and to provide a separate jury for each hearing.

Before jury selection began, Nelson Shelton made a formal motion to sever his trial.[68] Ironically, neither Outten nor Steven Shelton joined in Nelson's motion or took a position on the matter.[69] The Superior Court denied Nelson's motion to sever the trial. At an office conference prior to the beginning of the penalty hearing, the court and all counsel briefly discussed severing the penalty hearing. None of the defendants formally moved for severance and no severance occurred.

On direct appeal, Shelton and Outten argued that the Superior Court should have severed the guilt phase of the trial.[70] This Court rejected that argument.[71] Now, Shelton argues that counsel was deficient in failing to move to sever the penalty hearing.

We reject Shelton's contention on two grounds: (1) Superior Court Criminal Rule 61(i)(4) bars Shelton's claim as formerly adjudicated,[72] and (2) under Superior Court Criminal Rule 61(i)(3), Shelton is unable to show cause and actual prejudice for his failure to raise the issue at trial or on direct appeal.

### (a) Superior Court Criminal Rule 61(i)(4) Bars Shelton's Claim as Formerly Adjudicated

On direct appeal, both Shelton and Outten argued that the Superior Court erred in failing to separate the trials for the three defendants.[73] This Court held that "[n]either defendant has met his

---

**66.** *Bailey,* 521 A.2d at 1077.

**67.** Appellant's Op. Br. at 42.

**68.** *State v. Outten,* Del.Super., Cr. A. No. IN–92–01–11440–1158, 1992 WL 208294 (Aug. 7, 1992) (Mem.Op.).

**69.** *Id. Compare Floudiotis,* 726 A.2d at 1209–1214 (all four codefendants made or joined motion to sever trial).

**70.** *Shelton I,* 650 A.2d at 1298.

**71.** *Id.*

**72.** Super. Ct.Crim. R. 61(i)(4) provides:

> Former adjudication. Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice.

**73.** *Shelton I,* 650 A.2d at 1298.

burden of demonstrating substantial injustice and unfair prejudice requisite for showing the necessity of separate trials." [74] We held that, although antagonistic defenses between co-defendants is a fact to be considered when determining whether severance should be granted, "[t]here was no such antagonism in the instant case." [75] Accordingly, we found that the trial court did not abuse its discretion by denying the motion to sever. [76]

With regard to the bar of Superior Court Criminal Rule 61(i)(4), Shelton argues that this Court did not adjudicate the penalty phase severance issue now raised postconviction when this Court considered the guilt phase severance issue on direct appeal. Shelton contends that the issue at bar does not constitute a relitigation of the prior severance issue, but addresses a new and distinct argument not raised on direct appeal.

We disagree. A motion to sever the trial necessarily includes the penalty hearing because the penalty hearing is but a smaller part of the trial. Our decision on direct appeal that Shelton had not demonstrated the unfair prejudice required to mandate separate trials included the related argument concerning unfair prejudice flowing from a joint penalty hearing. Accordingly, Superior Court Criminal Rule 61(i)(4) precludes Shelton from relitigating the severance issue under the guise of ineffective assistance of counsel. [77]

### (b) Under Superior Court Criminal Rule 61(i)(3), Shelton Is Unable to Show Cause for His Procedural Default and Actual Prejudice.

Even if we consider Shelton's argument as previously unadjudicated, under Superior Court Criminal Rule 61(i)(3), Shelton is unable to show cause and actual prejudice for his failure to raise the issue at trial or on direct appeal. [78] Again, Shelton couches his argument in a claim for ineffective assistance of counsel in which he must show that counsel's performance was objectively unreasonable and that he was prejudiced by the outcome. [79]

Shelton argues that a joint penalty phase hearing deprived him of his constitutional right to individualized consideration before the imposition of a death sentence. Shelton contends counsel was deficient in failing to move to sever the penalty hearing for the following reasons:

(1) The court improperly limited Shelton's right to allocution;

(2) The negative evidence pertaining to Outten and Nelson Shelton "smeared" Steven and had a negative influence on the jury's view of all defendants;

(3) Because it is human nature to treat individuals similarly situated in an equal manner, the joint penalty phase hearing unduly pressured the jury to treat the defendants identically;

74. *Id.*

75. *Id.*

76. *See id.*

77. *See Skinner v. State,* Del.Supr., 607 A.2d 1170 (1992). In *Skinner,* on direct appeal, Skinner claimed that despite defense counsel's failure to request a particular jury instruction, it was plain error for the trial judge not to give the instruction. *See id.* at 1172. After that claim was rejected on appeal, Skinner moved for postconviction relief, arguing that defense counsel had been ineffective in failing to request the instruction. *See id.* This Court rejected Skinner's argument, holding that the "disposition of Skinner's challenge to the absence of a specific jury instruction ... in his direct appeal was, in fact, a substantive resolution of Skinner's present ineffectiveness of counsel's claim." *Id.* Accordingly, the Superior Court's summary denial of Skinner's claim pursuant to Super. Ct.Crim. R. 61(i)(4) was correct.

78. *See* Super. Ct.Crim. R. 61(i)(3); *Younger,* 580 A.2d at 555–56.

79. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; *Flamer,* 585 A.2d at 753.

(4) Nelson Shelton's desire to be put to death, his silence on the issue of his deprived childhood, and inaction at the penalty phase was prejudicial/antagonistic to Steven;

(5) It is unrealistic to believe the jurors were able to segregate and compartmentalize the aggravating and mitigating factors and apply them fairly to each defendant;

(6) Mitigating factors, such as deprived childhoods, are trivialized in joint penalty hearings when similar arguments are made by multiple defendants;

(7) A joint penalty phase hearing deprived Steven from calling Nelson Shelton as a witness to testify as to Steven's minimal culpability, or to support his mitigating defense of a deprived childhood.[80]

■ Despite these allegations, Shelton has presented no facts to overcome the "strong presumption that [counsel's] representation was professionally reasonable."[81] As we held on direct appeal, Shelton has failed to show that a joint trial or penalty hearing caused him substantial injustice and unfair prejudice.[82]

■ First, the State properly joined all three defendants in the same indictment.[83] "Ordinarily, when defendants are indicted jointly, they are also tried together."[84] Second, from the outset, Shelton and trial counsel made a tactical decision not to

move for severance.[85] In fact, prior to the penalty hearing, counsel and the court discussed the severance issue in an office conference, but counsel never moved for severance and the court did not grant it sua sponte. As we ruled on direct appeal, the requisite antagonism between the codefendants was lacking to request a severance.[86] Finally, Shelton fails to produce evidence that counsel's representation in the penalty phase was unprofessional in any way. Thus, we are convinced that counsel's decision to pursue a joint trial, and thus a joint penalty hearing, was reasonable because counsel would have been unsuccessful in arguing for separate penalty hearings had that been Shelton's defense strategy.

Because Shelton has failed to demonstrate that counsel's performance was objectively unreasonable, we need not explore whether counsel's alleged ineffective assistance prejudiced Shelton.[87] Nevertheless, counsel's failure to request a separate penalty hearing did not prejudice Shelton.

■ First, the joint penalty hearing did not deprive Shelton of the right to allocution. Shelton appears to argue that he was unable to speak fully in allocution because his statements would be prejudicial to his codefendants. This argument runs contrary to the tactical decisions that Shelton initially made during the penalty hearing not to present mitigating evidence

80. See Appellant's Op. Br. at 46–47.

81. Flamer, 585 A.2d at 753.

82. Shelton I, 650 A.2d at 1298 (citing Lampkins v. State, Del.Supr., 465 A.2d 785, 794 (1983)).

83. See 11 Del. C. § 522(a); Super. Ct.Crim. R. 8(b); Manley v. State, Del.Supr., 709 A.2d 643, 652 (1997), cert. denied, 525 U.S. 893, 119 S.Ct. 214, 142 L.Ed.2d 176 (1998).

84. Manley, 709 A.2d at 652 (citing Jenkins v. State, Del.Supr., 230 A.2d 262, 272 (1967)).

85. See State v. Outten, Del.Super., Cr. A. No. IN–92–01–11440–1158, 1992 WL 208294, Herlihy, J. (Aug. 7, 1992) (Mem.Op.) (Nelson Shelton's motion to sever). When Nelson Shelton made his motion to sever, the Superior Court was aware of Shelton's apathy on the issue. "Defendant Steven Shelton takes no position on his brother's motion." See id. at 1. "Oddly enough, the defendant who should be pursuing this motion is Steven Shelton .... The Court has considered whether he is inviting error, a ground for appeal, by this stance." See id. at 7.

86. Shelton I, 650 A.2d at 1298.

87. See Flamer, 585 A.2d at 747–48.

nor beg for mercy. The Superior Court correctly held:

> What Steven said to the jury was consistent with what his lawyer and he told the Court outside the jury's presence was the manner he wanted to present his case during the penalty hearing. He felt he could not ask for mercy after the jury had found him guilty of a heinous murder. To do so, he acknowledged, would risk offending the jury and prompting a greater likelihood of a death sentence recommendation. Steven had indicated to his trial counsel and the Court that this would be his approach prior to the Court indicating the parameters of allocution. Thus, those parameters in no way affected his talk to the jury.[88]

In addition, Shelton fails to indicate what he would have said differently in allocution had the penalty hearing been severed.[89] Thus, Shelton was not prejudiced by counsel's failure to request a severance of the penalty hearing.[90]

 Second, Steven claims that the presence of Outten and Nelson at his penalty hearing had a negative impact on him and all of the defendants. Steven argues that he was "smeared" by the negative evidence pertaining to Outten and Nelson. But he fails to point to any evidence that improperly "smeared" him, nor does he present any evidence that proves it was difficult for him to segregate his case from his co-defendants. Steven presented his own case at the penalty hearing with three witnesses testifying on his behalf and Steven himself addressing the jury in allocution. In addition, Steven overlooks the fact that much of the substantial negative evidence proffered at the penalty hearing pertained to him, including the 1982 rape conviction and a robbery just twelve days before Mannon's murder. Outten, whom Steven claims "smeared" him in the joint hearing, did not have the history of violent criminal behavior that haunted the Shelton brothers.

Shelton also ignores the fact that the trial court twice instructed the jury to consider the evidence separately as to each defendant.[91] For example, at the conclusion of the penalty hearing, the court stated to the jury:

> In considering the punishment to be imposed and your recommendations, you must at all times remember that each defendant's case must be considered by you individually. Each defendant is entitled to an individualized determination of the appropriate punishment recommendation to be imposed without regard to your determinations as to the remaining defendants. You should also remember that any statements alleged to have been made by any defendant may only be considered by you in determining the punishment recommendation to be imposed on the particular defendant who made the statement. Any such statement may not be used or considered by you in any way against any of the other defendants.[92]

The jury vote on Steven's sentence is evidence that the jurors followed the court's instruction to segregate the defendants. In Steven and Nelson Shelton's case, the vote was eight to four in favor of the death sentence. In Outten's case, the vote was seven to five in favor of death. Therefore, the jury did consider the defen-

---

88. *Shelton II*, Mem. Op. at 92–93. At opening statements during the penalty hearing, Shelton's counsel stated to the jury: "My client has instructed me to advise you that he will not be begging for his life in this case." Tr. at 55 (Mar. 1, 1993).

89. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Flamer*, 585 A.2d at 753.

90. We will discuss the issue of allocution more fully in section V of this Opinion, *infra*.

91. The Superior Court issued the first instruction before the penalty hearing began. *See* Tr. at 40–41 (Mar. 1, 1993). The second instruction occurred at the conclusion of the hearing. *See* Tr. at 71–72 (Mar. 4, 1993).

92. Tr. at 71 (Mar. 4, 1993).

dants individually when making its recommendation. We are convinced that the presence of Nelson and Outten at the joint penalty hearing did not deprive Steven of his constitutional right to individualized consideration before the imposition of a death sentence.

■ On a related claim, we are not persuaded by Steven's argument that the jury was influenced by Nelson Shelton's decision to remain silent and not to present mitigating evidence during the penalty phase. Steven contends that Nelson's apathy and inaction was antagonistic to him. But Steven fails to realize that the trial court never informed the jury that Nelson was not opposing the imposition of the death penalty. Steven also ignores the fact that the jury voted eight to four as to both him and Nelson. This shows that the jury did not hold Nelson's silence against him or Steven. We agree with the Superior Court that Steven's argument "overlooks the substantial aggravating circumstances independently applicable to Nelson and Steven .... This argument is no more than conjecture." [93]

■ Finally, Steven claims that a joint penalty hearing precluded him from calling Nelson as a witness to testify as to Steven's minimal culpability, or to support his mitigating defense of a deprived childhood.[94] This argument is without merit. First, Steven does not indicate what Nelson would have said about the circumstances of the murder to substantiate his claim of minimal culpability. In fact, there was a strong possibility that Nelson would have pointed the finger at Steven had Steven called Nelson. Second, there is no indication in the record that Steven ever asked Nelson to testify on his behalf. Fi-

nally, now that Nelson is deceased, it is impossible for Steven to prove what Nelson would have said had Steven called him as a witness at the penalty hearing.

■ Even assuming trial counsel had been deficient for failing to move to sever the penalty hearing, Shelton was not prejudiced by counsel's failure to do so. Shelton has not proven a reasonable probability that, but for counsel's error, the jury would have recommended a life sentence rather than death.[95] The same finding applies to appellate counsel, who failed to raise on appeal the issue of severing the penalty phase.

## V. Ineffective Assistance of Counsel with Regard to Allocution

Shelton argues that the Superior Court violated his right to a fair penalty hearing by prohibiting him from discussing the events of January 11 and 12, 1992 during allocution. According to Shelton, this limiting instruction "had a chilling effect ... and prevented him from fully expressing his feelings to the jury, including any statements regarding relevant matters such as the circumstances of the crime, his conduct and relative culpability, if any." [96]

Shelton contends the court infringed upon his constitutional right to present mitigating evidence by limiting his right to speak freely in allocution. Namely, he argues that the limiting instruction violated his right to allocution under Superior Court Criminal Rule 32, as well as the Eighth and Fourteenth Amendments of the United States Constitution. This issue was not presented to the trial court at the penalty hearing, no objection was raised at that time to the court's limiting instruction, no proffer was made of the substance

---

**93.** *Shelton II,* Mem. Op. at 85–86.

**94.** Shelton presented three witnesses in support of his mitigating defense of a deprived childhood: his half-brother, Edward, his half-sister, Dorothy, and his half-sister, Louise. Each testified on Shelton's troubled past and difficult childhood. Shelton also briefly addressed the jury in allocution at the conclu-

sion of the testimony of the witnesses. Shelton refused to plead for his life or apologize for his actions.

**95.** *See Flamer,* 585 A.2d at 753.

**96.** Appellant's Op. Br. at 52.

of what Shelton would have said to the jury absent the limitation and no showing has been made that Shelton was prejudiced by the limitation. It is clear from the record of the penalty hearing and the trial court's findings on the postconviction proceedings that a fully-informed Shelton and his counsel acquiesced in the limitation. Indeed, the record unequivocally shows that it was part of Shelton's strategy at that time not to go into those events in his allocution to the jury.

This issue was not raised on direct appeal. It arises for the first time in this postconviction proceeding under Superior Court Criminal Rule 61. Shelton now couches this argument in a claim of ineffective assistance of counsel, arguing that trial counsel was deficient in failing to object to the court's limitation on allocution and that appellate counsel likewise was ineffective in failing to raise the issue on appeal.

 We are not persuaded by Shelton's argument that counsel acted in an objectively unreasonable manner in failing to object to the court's limiting instruction. Shelton was not prejudiced by the limitation on allocution because, in any event, his strategy was consistent with the limitation—he did not want to present mitigating circumstances that involved going into the facts of the murder before the jury in the penalty phase. Thus, the trial judge's limitation was a moot point. Under Superior Court Criminal Rule 61(i)(3) and the particular circumstances under which the allocution issue arose in this case, Shelton has failed to show plain error or ineffective assistance of counsel.[97]

### (a) The Superior Court's Limiting Instruction on Shelton's Allocution

It is important to understand the context in which the court's limiting instruction on allocution arose. First, Shelton had asked the trial court to permit him to represent himself. Second, Mr. Willard, his counsel to this point, acted as his stand-by counsel and was representing him under the awkward conditions that Shelton had imposed on Mr. Willard's role. Third, Mr. Willard was fully involved in the colloquy with the court on the issues of (a) Shelton's desire to represent himself; (b) Shelton's strategy not to present mitigating evidence even in the face of questions raised on the record by Mr. Willard and the court; and (c) the colloquy among the court, Shelton and Mr. Willard on the scope of allocution in this context. That series of events is detailed in the excerpts from pages 4 to 94 of the transcript of the February 26, 1993 proceedings and at pages 62 and 63 of the March 3, 1993 proceedings in the penalty phase. Those excerpts are set forth in Appendix A to this Opinion. Excerpts from pages 88–94 of the trial judge's findings and rulings on the allocution issue in the postconviction proceedings are set forth in Appendix B to this Opinion.

In the penalty phase hearing, the Superior Court twice gave Shelton instructions limiting the scope of his allocution. Trial counsel never objected. The first limiting instruction occurred while the court and counsel discussed Shelton's desire to represent himself during the penalty phase.

> Trial Counsel: Secondly, he asked that in my position of assisting him, that I be able to give closing argument to the jury and argue my position on—against the death penalty because he feels that I can do that better than he could. And he reserves, your Honor, most particularly and first and most importantly his right to allocution. He has indicated to me that he's prepared to take the stand and make a statement to the jury, with or without having called witnesses, and that he understands that he has a right to allocution without cross examination.

---

97. *See* Super. Ct.Crim. R. 52(b); *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052; *Wright* v. *State,* Del.Supr., 671 A.2d 1353, 1356 (1996).

The Court: Well, if he takes the stand, he's not speaking in allocution as such. That will be a separate matter during which he cannot talk about the events of January 11, 12, 1992.

Trial Counsel: Excuse me, your Honor.

The Court: He can't get into—*if he's speaking in allocution, he cannot discuss the events of January 11 and 12, 1992.*

\* \* \* \*

Trial Counsel: *Your Honor, he understands that. He can't talk about any factual evidence. What he would intend to address them on is his life or his feelings about this matter, and that he believes and understands that if he does that and does not talk about any factual circumstances, that he can do that without cross examination.*[98]

Later in the day, the court granted Shelton's request to represent himself during the penalty hearing with trial counsel acting only as "stand-by counsel."[99] At that point, the following colloquy occurred between the court and Shelton:

The Court: Further, it does not prevent you in any way from speaking to the jury in allocution and to me. Do you understand that?

Shelton: Allocution, I don't—

The Court: Allocution is a very technical word, speaking to the jury on your own behalf. I apologize for using a word that [even] most lawyers don't know. Allocution is a very legalistic way for asking the sentencing authority, whether it's a judge or jury, to give you mercy, spare your life in this case, and sentence you to life. That's what it really means, to explain your humanity, you know.

Shelton: I understand.

The Court: Whether you want to—you can't argue about the facts. You can talk about yourself, your background, your upbringing, your education, your folks at home, any alcohol abuse problems, things like that. You can talk about all those things as much as you want. You just can't talk about the facts surrounding the murder. Do you understand that?

Shelton: Yes.[100]

At the penalty hearing on March 3, 1993, Shelton spoke briefly in allocution. The entire text of his allocution is as follows:

Ladies and gentlemen of the jury, I stand before you not to plead for my life. I feel that's wrong and improper and basically disrespectful to the victim's family and to mine. The State has painted a picture, and that picture is not very pretty, pertaining to me and my co-defendants. And I would just like to present to the jury a different side or a different meaning to Steven Shelton. The State has pictured me as being a monster, as being a rapist, as being a violent individual, but as you heard from my family, that's not so. The State only presents one side of the picture. There's two sides to every story. And the State just presents a negative side. The jury has found me guilty of these allegations, and now it's the jury's turn to render a verdict. And that verdict is either life in jail or death. Again, I'm not here to plead for my life, but just ask the jury to be fair in their decisions. That's all I have to say.[101]

Shelton's strategy was to present little mitigating evidence at the penalty hearing and not to speak about the circumstances of the murder during allocution.[102] But he

**98.** Tr. at 56–57 (Feb. 26, 1993) (emphasis supplied).

**99.** Tr. at 88 (Feb. 26, 1993).

**100.** Tr. at 93–94 (Feb. 26, 1993).

**101.** Tr. at 62–63 (Mar. 3, 1993).

**102.** *See* Tr. at 6–7, 10, 14–15 (Feb. 26, 1993); Tr. at 17–57, 62–63 (Mar. 3, 1993).

now argues that counsel rendered ineffective assistance in failing to object to the court's instruction limiting his allocution, and that he was prejudiced by counsel's omission.

### (b) The History of Allocution and its Development under Modern Criminal Procedure

Allocution is a historic common-law right of a defendant in a capital case.[103] At common law, allocution consisted of the court's asking the defendant "if he [had] anything to offer why judgment [of death] should not be awarded against him."[104] Allocution provided the accused with the only opportunity to present one of four strictly defined reasons why he should not be executed: (1) he was not the person convicted; (2) he had the benefit of clergy or pardon; (3) he was insane; or (4) if a woman, she was pregnant.[105]

At common law, allocution was essential because the accused was neither permitted to have counsel at trial nor to testify on his or her own behalf.[106] Furthermore, the judge possessed little sentencing discretion because the mandatory punishment for almost all felonies was death.[107] Thus, "the defendant's response to the tribunal's invitation to speak had little to do with pleading for leniency but was the defendant's only opportunity to present one of the specific legal defenses which might arrest the proceedings."[108]

Allocution had another purpose at common law. Not only were convicted defendants put to death, they also were "placed in a state of attainder."[109] This meant their property was forfeited to the crown and their descendants declared "of corrupt blood."[110] Before land or title were taken from descendants, the court afforded them allocution to give reason why their ancestor should not have been condemned.[111] Accordingly, the failure to provide allocution in capital cases constituted reversible error.[112]

With the development of modern criminal procedure, such as the right to counsel and the accused's right to testify, the need for common law allocution diminished. Today, it is argued, "any defense, including those recognized at common law, can be properly brought up by counsel during the

103. The doctrine of allocution is based on four cases from England. *See* Paul W. Barrett, *Allocution,* 9 Mo. L.Rev. 115, 121 (1944) (citing *Anonymous,* 3 Mod. 265, 87 Eng. Rep. 175 (K. and Q.B. 1682–1690); *Rex & Regina v. Geary,* 2 Salk. 630, 91 Eng. Rep. 532 (K.B. 1689–1712); *The King v. Speke,* 3 Salk. 358, 91 Eng. Rep. 872 (K.B.1689–1712); *Rex v. Royce,* 4 Burr. 2073, 2086, 98 Eng. Rep. 81 (K.B.1767)).

104. Barrett, *supra* note 103, at 117 (citation omitted). *See also* 3 Charles Alan Wright, *Federal Practice and Procedure* § 525, at 82 (2d ed. 1982) ("The common law for many centuries has recognized the right of a defendant to 'allocution,' a formal statement by the defendant of any legal reason why he could not be sentenced.").

105. *See* Barrett, *supra* note 103, at 120–21.

106. *See Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961). In England, "it was the obligation of the judge to look after the interest of the criminal defendant, to examine witnesses on his behalf and to guard against an illegal or unjust convic-

tion." *State v. Vaccaro,* 121 R.I. 788, 403 A.2d 649, 650 (1979) (citing 1 Chitty, Criminal Law 407 (3d Am. ed.)); *Harris v. State,* 306 Md. 344, 509 A.2d 120, 123–27 (1986).

107. Under the common law, death was the punishment for all felonies except petty larceny and mayhem. *See* Note, *Procedural Due Process at Judicial Sentencing for Felony,* 81 Harv. L.Rev. 821 n. 2 (1968).

108. Jonathan S. Marshall, *Lights, Camera, Allocution: Contemporary Relevance or Director's Dream?,* 62 Tul. L.Rev. 207, 211 (1987).

109. *State v. Webb,* 242 Kan. 519, 748 P.2d 875, 878 (1988) (citing *Anonymous,* 3 Mod. 265, 87 Eng. Rep. 175 (K.B.1689) and Barrett, *supra* note 103, at 121–22).

110. *Id.*

111. *Id.*

112. *See* Barrett, *supra* note 103, at 121.

trial."[113] As the trial courts have been granted greater discretion in sentencing, allocution has evolved into a mechanism in which a defendant in a criminal case may express remorse for his crime and plead for leniency.[114] In the words of Justice Frankfurter:

> We are not unmindful of the relevant major changes that have evolved in criminal procedure since the seventeenth century—the sharp decrease in the number of crimes which were punishable by death, the right of the defendant to testify on his own behalf, and the right to counsel. But we see no reason why a procedural rule should be limited to the circumstances under which it arose if reasons for the right it protects remain. None of these modern innovations lessens the need for the defendant, personally, to have the opportunity to present to the court his plea in mitigation. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.[115]

Presently, allocution serves two purposes: "First, it reflects our commonly-held belief that our civilization should afford every defendant an opportunity to ask for mercy. Second, it permits a defendant to impress a jury with his or her feelings of remorse."[116] Put another way, allocution is necessary because it affords "an opportunity for the jury to learn about the 'whole person'"[117] and "it bespeaks our common humanity that a defendant not be sentenced to death by a jury 'which never heard the sound of his voice.'"[118]

Modern treatment of the right to allocution has varied significantly. In fact, we are surprised by the lack of uniformity among the federal courts and the state jurisdictions that provide a right to allocution. On the one hand, several jurisdictions hold that the common-law right of allocution encompasses the right of the defendant to make unsworn statements to the jury that are not subject to cross-examination.[119] Moreover, some states have determined that allocution is a right protected by their state constitutions.[120]

113. Marshall, *supra* note 108, at 211 (citing Note, *Procedural Due Process at Judicial Sentencing for Felony*, 81 Harv. L.Rev. 821, 832 (1968)).

114. *See Homick v. State*, 108 Nev. 127, 825 P.2d 600, 604 (1992); *State v. Stephenson*, Tenn.Supr., 878 S.W.2d 530, 550 (1994).

115. *Green*, 365 U.S. at 304, 81 S.Ct. 653.

116. *State v. DiFrisco*, 137 N.J. 434, 645 A.2d 734, 757 (1994); *see also State v. Ricky G.*, 110 N.M. 646, 798 P.2d 596, 601 (1990) (Hartz, J., concurring in judgment).

117. *State v. Hightower*, 120 N.J. 378, 577 A.2d 99, 117 (1990).

118. *State v. Zola*, 112 N.J. 384, 548 A.2d 1022, 1046 (1988) (citing *McGautha v. California*, 402 U.S. 183, 220, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *vacated on other grounds*, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972).) *But see* Marshall, *supra* note 108, at 211–12. Marshall argues that the present use of allocution in the federal courts is "superfluous." *Id.* at 211. He contends that pleading for mercy in allocution "seems inappropriate in light of other trial safeguards, such as the right to counsel, the presentencing report,

and the fact that in instances where the defendant first pleads not guilty, he is subsequently allowed (or actually may be expected) to plead for forgiveness to the same crime he already said he did not commit." *Id.* at 212. Marshall also argues that "it is possible that rather than mitigating the sentence, the judge may increase the severity of the sentence if the convicted person says something the judge does not want to hear." *Id.*

119. *See, e.g., Harris v. State*, 306 Md. 344, 509 A.2d 120 (1986) (holding common law provides defendant must be afforded a fair opportunity to allocute); *Homick*, 825 P.2d at 604 (same); *Zola*, 548 A.2d at 1046 (recognizing under the court's supervisory power the right of a capital defendant to make an unsworn plea for mercy to the jury); *State v. Lord*, 117 Wash.2d 829, 822 P.2d 177, 216 (1991) (indicating that the defendant had a right to make an unsworn plea for mercy before the jury that was not subject to cross-examination).

120. *See, e.g., DeAngelo v. Schiedler*, 306 Or. 91, 757 P.2d 1355, 1357–58 (1988) (holding right of allocution is guaranteed by state constitution); *Leonardo v. State*, R.I.Supr., 444

Some jurisdictions have interpreted the right of allocution broadly, and allow a defendant to explain in his or her own words the circumstances of the crime and his or her feelings regarding his or her conduct, culpability, and sentencing.[121] A minority of jurisdictions adheres strictly to the common-law right of allocution, in that the court will ask the accused only whether any legal cause exists to show why judgment should not be pronounced against him or her.[122]

On the other hand, several jurisdictions have held that there is no common-law right to allocution.[123] Moreover, the majority of federal courts and state jurisdictions hold that the United States Constitution does not protect the right to allocution.[124]

A.2d 876, 878 (1982) (same); *Harvey v. State,* Wyo.Supr., 835 P.2d 1074, 1081–82 (1992) (same).

**121.** The State of Maryland exemplifies the most liberal approach to allocution, seemingly permitting the defendant to make virtually limitless unsworn statements not subject to cross-examination on the events of the crime itself. *Thanos v. State,* 330 Md. 77, 622 A.2d 727, 733 (1993) (holding purpose of allocution is to provide defendant with opportunity to refute or explain any information presented to the sentencing judge); *Shifflett v. State,* 315 Md. 382, 554 A.2d 814, 817 (1989) (holding reason for allocution is to improve truth-finding process by considering comments from defendant's perspective); *Booth v. State,* 306 Md. 172, 507 A.2d 1098, 1111 (1986), *vacated on other grounds,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (holding purpose of allocution is to provide a convicted murderer the opportunity to make an unsworn statement in mitigation of the death penalty without being subject to cross-examination and that factual content of allocution is not limited to the record in the case); *Harris v. State,* 306 Md. 344, 509 A.2d 120 (1986) (holding allocution provides defendant with opportunity to explain circumstances of the crime and his feelings regarding conduct, culpability, and sentencing without subjecting himself to cross-examination); *State v. Calhoun,* 306 Md. 692, 511 A.2d 461 (1986) (same); *see also State v. Chow,* 77 Hawai'i 241, 883 P.2d 663, 672 (1994) (holding allocution "provides offenders the opportunity to contest any disputed factual basis for sentencing and [to] persuade the judge to choose a favored sentence alternatively").

**122.** *See, e.g.,* Cal. Pen.Code § 1200; Pa. R.Crim. P. 1405(c)(1); P.R. Laws Ann. tit. 34, Rule 166; Tex.Crim. Proc.Code Ann. § 42.07; 19.2 Va.Code § 19.2–298.

**123.** *See, e.g., Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846, 857–58 (1989) (holding common-law right to allocution does not exist in penalty phase of capital murder prosecution); *People v. Robbins,* 45 Cal.3d 867, 248 Cal.Rptr. 172, 755 P.2d 355, 369 (1988) ("Given [that a capital defendant possesses the right to testify and offer other mitigating evidence], we fail to see the need, much less a constitutional requirement, for a corresponding 'right to address the sentencer without being subject to cross-examination' in capital cases."); *People v. Kokoraleis,* 132 Ill.2d 235, 138 Ill.Dec. 233, 547 N.E.2d 202, 204 (1989) (declining to exercise its supervisory power to recognize a rule "allowing defendants in capital sentencing hearings ... to make a brief, unsworn plea for leniency without being subject to cross-examination"); *State v. Whitfield,* Mo.Supr., 837 S.W.2d 503, 514 (1992) ("Despite defendant's claim to the contrary, the right of allocution in Missouri does not extend to addressing the jury."); *State v. Perkins,* 345 N.C. 254, 481 S.E.2d 25, 41 ("[W]e have held that a defendant does not have a constitutional, statutory, or common law right to make unsworn statements of fact to the jury at the conclusion of a capital sentencing proceeding."), *cert. denied,* 522 U.S. 837, 118 S.Ct. 111, 139 L.Ed.2d 64 (1997); *Duckett v. State,* Okla.Crim.App., 919 P.2d 7, 22 (1995) ("[W]e conclude that there is no statutory, common-law or constitutional right of a defendant to make a plea for mercy or otherwise address his sentencing jury, in addition to closing argument by counsel." ) (footnote omitted); *Stephenson,* 878 S.W.2d at 551 (holding no common-law right of allocution exists in Tennessee because the right is nothing more than an empty formality in light of the criminal defendant's right to counsel).

**124.** *See, e.g., United States v. Hall,* 5th Cir., 152 F.3d 381, 394 (1998) (no constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross examination), *cert. denied,* —— U.S. ——, 119 S.Ct. 1767, 143 L.Ed.2d 797 (1999); *United States v. Li,* 2d Cir., 115 F.3d 125 (1997) (no constitutional right to allocution even when affirmative request for allocution is denied); *United States v. Fleming,* 11th Cir., 849 F.2d 568 (1988) (same); *Martin v. United States,* 10th Cir., 309 F.2d 81 (1962) (same); *United States v. Coffey,* 6th Cir., 871 F.2d 39

The federal courts of appeals are split on whether the right of allocution expressly provided by Rule 32(c)(3)(C) of the Federal Rules of Criminal Procedure is a right guaranteed by the Due Process Clause of the Fourteenth Amendment.[125] To date, the United States Supreme Court has not addressed squarely the issue of whether the United States Constitution protects the right of a capital defendant to make before the jury an unsworn statement that is not subject to cross-examination.[126]

Because of its deep roots in the common law, the Federal Rules have not abolished the right to allocution.[127] "Justifications for the federal courts' continued use of allocution include assuring the sentencing court that the person before it is the one adjudged guilty, providing an opportunity for the defendant to contest any disputed factual basis for the sentence, and attempting to persuade the judge to impose a favorable sentence. Thus, the federal rule grants the convicted person a right not allowed at common law—the right to plead for leniency or to show mitigating circumstances." [128]

In *Lockett v. Ohio*, the Court held that the Eighth and Fourteenth Amendments require that the trial court in a capital case "not be precluded from considering, as a mitigating factor, *any* aspect of a defendant's character or record and *any* of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." [129] In *Lockett*, the Supreme Court mandated that the accused be permitted to present "any" *evidence* in mitigation of a death sentence, including

(1989) (holding allocution not required prior to resentencing defendant for probation revocation because no right to due process exists ); *United States v. Prince*, 5th Cir., 868 F.2d 1379 (1989) (no constitutional right to allocution); *United States v. De La Paz*, 5th Cir., 698 F.2d 695 (1983) (same); *Robbins*, 248 Cal.Rptr. 172, 755 P.2d at 369 (same); *Kokoraleis*, 138 Ill.Dec. 233, 547 N.E.2d at 224 (same); *People v. Nicolaus*, 54 Cal.3d 551, 286 Cal.Rptr. 628, 817 P.2d 893, 910 (1991) (same); *People v. Keenan*, 46 Cal.3d 478, 250 Cal.Rptr. 550, 758 P.2d 1081, 1102 (1988) (same); *Perkins*, 481 S.E.2d at 41 (same); *Duckett*, 919 P.2d at 22 (same); *Stephenson*, 878 S.W.2d at 551 (same); *People v. Gaines*, 88 Ill.2d 342, 58 Ill.Dec. 795, 430 N.E.2d 1046, 1064 (1981) (holding United States Supreme Court has left open issue of whether allocution is a constitutional right); *see also generally* on the issue 3 ABA Standards for Criminal Justice, Standard 7–5.2(b) commentary (2d ed.1986) (right to allocution is recognized in most jurisdictions even though it probably is not of constitutional weight); 3 LaFave & Israel, *Criminal Procedure* § 25.1(f) (1984).

125. *See Stephenson*, 878 S.W.2d at 551. *Compare Boardman v. Estelle*, 9th Cir., 957 F.2d 1523 (1992) (holding allocution is a right guaranteed by the Due Process Clause), *with United States v. Hall*, 5th Cir., 152 F.3d 381, 396 (1998) (holding Constitution affords no right to make unsworn statement of remorse before the jury that is not subject to cross examination).

126. *See Hall*, 152 F.3d at 394; *Green v. French*, 4th Cir., 143 F.3d 865, 879 (1998), *cert. denied*, 525 U.S. 1090, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999). In *Hill v. United States*, the Court held that a district court's failure to ask expressly a defendant represented by counsel whether he wished to make a statement before imposition of sentence was not constitutional error. 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); *see also McGautha v. California*, 402 U.S. 183, 219 n. 22, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) (noting whether a trial court's denial of a defendant's request to plead for mercy rises to the level of a constitutional violation remains an open question), *vacated in part on other grounds, Crampton v. Ohio*, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972).

127. *See* Marshall, *supra* note 108, at 211; Fed. R.Crim. Proc. 32(c)(3)(C), which provides:

(3) Imposition of Sentence. Before imposing sentence, the court must:
(C) address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence.
The Delaware Superior Court Criminal Rule 32(a)(1)(c) is identical to its federal counterpart.

128. Marshall, *supra* note 108, at 211 (footnotes omitted).

129. 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (emphasis added).

the circumstances of the crime, so long as that evidence is relevant.[130] *Lockett,* however, did not involve allocution not subject to cross-examination.[131] It is essential to understand and apply properly this fundamental distinction between the unrestricted right to present relevant *evidence* and speaking in allocution without being subject to cross-examination. Notwithstanding the multitude of cases interpreting the right of an accused to present evidence in mitigation of a death sentence, the law surrounding the right to allocution, even in death penalty cases, remains unclear. Indeed, it is unclear under Delaware law. Thus, the issues presented here are of first impression.

■ With regard to the United States Constitution, we decline to decide whether the Eighth and Fourteenth Amendments provide a right of a capital defendant to make before the jury an unsworn statement that is not subject to cross-examination. Instead, we hold that the common law right of the defendant to speak in connection with a sentencing is based on

Delaware Superior Court Criminal Rule 32(a)(1)(C) [132] and the Delaware death penalty statute, 11 *Del. C.* § 4209.[133] Moreover, Delaware decisional law has confirmed the right of a defendant to speak in allocution.[134] Although in a different procedural context, we have stated that "[a]ny failure of a trial court to adhere to the right [of allocution] is 'an error which is neither jurisdictional nor constitutional [and] not a fundamental defect which inherently results in a complete miscarriage of justice' so as to constitute a denial of a fair trial." [135]

It is desirable that we be clear that the basis for our decision in this matter rests solely on state law as an adequate and independent ground. That is, our conclusion that the defendant has a right to allocution as defined and limited here is not a right granted by either the federal or state constitutions. It is a right that is grounded solely on the Superior Court Criminal Rule, the Delaware death penalty statute and Delaware decisional law. No federal constitutional, statutory or deci-

130. *See id.* at 604 n. 12, 98 S.Ct. 2954 ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.").

131. In holding the Ohio death penalty statute unconstitutional because of its automatic nature, the *Lockett* Court said:

We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed . . . .
[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.
*Id.* at 604, 98 S.Ct. 2954 (footnotes omitted).

132. *See Hooks v. State,* Del.Supr., 429 A.2d 1312, 1313 (1981); Super. Ct.Crim. R. 32(a)(1) provides:

Before imposing sentence, the court shall also . . . (B) Afford counsel for the defendant an opportunity to speak on behalf of the defendant, and (C) Address the defendant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence.
Super. Ct.Crim. R. 32(a)(1).

133. 11 *Del. C.* § 4209(c)(2) provides:

At the hearing the Court shall permit argument by the State, the defendant and/or the defendant's counsel, on the punishment to be imposed. Such argument shall consist of opening statements by each, unless waived, opening summation by the State, rebuttal summation by the defendant and/or the defendant's counsel and closing summation by the State.
11 *Del. C.* § 4209(c)(2).

134. *See DeShields v. State,* Del.Supr., 633 A.2d 369 (1993), Order at ¶ 2; *Hooks,* 429 A.2d at 1313.

135. *DeShields,* 633 A.2d 369, Order at ¶ 2 (defendant rejected opportunity to speak in

sional law is implicated, and federal decisional law is referred to only for the purpose of guidance.[136]

■■■■ A principal purpose of allocution is to afford the accused an opportunity to ask for mercy and to impress a jury with his or her feelings of remorse.[137] Accordingly, during allocution, the accused may make "acceptable expressions of remorse, pleas for leniency, and plans of hopes for the future."[138] Some cases hold that the defendant may not "rebut any facts in evidence, ... deny his guilt, or indeed ... voice an expression of remorse that contradicts evidentiary facts."[139] It has been held that the United States Constitution "in no way mandates reconsideration by capital juries, in the sentencing phase, of their 'residual doubts' over a defendant's guilt,"[140] and that permitting a defendant to present such self-serving re-

marks "would be unfair to the State and could have the effect of misleading the jury."[141]

■■■ This is not our view, however. Our view is that there is no blanket rule that would preclude a defendant who wished to do so from discussing or arguing in allocution facts already in evidence either in the guilt phase or the penalty phase. Under Superior Court Criminal Rule 32(a)(1)(C) and 11 *Del. C.* § 4209(c)(2), the defendant also may have the right in certain cases to present at the penalty phase new *evidence* relating to the circumstances of the crime through his own statement, but that statement of new *evidence* must be sworn and subject to cross-examination. Thus, if one were to view in isolation the trial judge's limitation here that Shelton "cannot discuss the events of January 11 and 12, 1992," such a

---

allocution) (citing *Hill,* 368 U.S. at 428, 82 S.Ct. 468).

**136.** *See Michigan v. Long,* 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *compare Ohio v. Robinette,* 519 U.S. 33, 36–38, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

**137.** *See DiFrisco,* 645 A.2d at 757; *see also State v. Ricky G.,* 110 N.M. 646, 798 P.2d 596, 601 (1990) (Hartz, J., concurring in judgment). *But see Thanos v. State,* 330 Md. 77, 622 A.2d 727, 733 (1993) (holding purpose of allocution is to provide defendant with opportunity to refute or explain any information presented to the sentencing judge); *Shifflett v. State,* 315 Md. 382, 554 A.2d 814, 817 (1989) (holding reason for allocution is to improve truth-finding process by considering comments from defendant's perspective); *Booth v. State,* 306 Md. 172, 507 A.2d 1098, 1111 (1986), *vacated on other grounds,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). In *Booth,* the Maryland Court of Appeals held that the purpose of allocution is to provide a convicted murderer the opportunity to make an unsworn statement in mitigation of the death penalty without being subject to cross-examination. *See id.* In Maryland, the factual content of the allocution is not limited to the record in the case. *See id.; see also Harris v. State,* 306 Md. 344, 509 A.2d 120, 127 (1986) (holding allocution provides defendant with opportunity to explain circumstances of the crime and his feelings regarding conduct, culpability,

and sentencing without subjecting himself to cross-examination).

**138.** *Homick,* 825 P.2d at 604.

**139.** *Zola,* 548 A.2d at 1045; *see also Echavarria v. State,* 108 Nev. 734, 839 P.2d 589, 596 (1992) (holding allocution is not intended to provide a defendant with an opportunity to introduce unsworn, self-serving statements of his innocence as an alternative to taking the stand); *State v. Loftin,* 146 N.J. 295, 680 A.2d 677, 709 (1996) (holding defendant in allocution is not authorized to argue legal points, advance or dispute facts, or attempt to exculpate himself; *Homick,* 825 P.2d at 604–05 (same) (citing *Zola,* 548 A.2d at 1046); *State v. Mak,* 105 Wash.2d 692, 718 P.2d 407 (1986)).

**140.** *Franklin v. Lynaugh,* 487 U.S. 164, 173–74, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (holding capital defendants do not have constitutional right to demand jury consideration of "residual doubts" in the sentencing phase because such "doubts are not over any aspect of petitioner's 'character,' 'record,' or a 'circumstance of the offense.' "); *see also Sims v. State,* Fla.Supr., 681 So.2d 1112, 1117 (1996) (holding residual doubt of guilt is not an appropriate mitigating circumstance during penalty hearing at capital murder trial).

**141.** *Loftin,* 680 A.2d at 710 (citing *Zola,* 112 N.J. 384, 548 A.2d 1022).

blanket preclusion is overbroad and could be erroneous in a given case if it denied a defendant who wanted to do so the right to discuss or argue facts already in evidence. But that is not this case.

### (c) Counsel's Failure to Object to the Court's Limiting Instruction on Allocution

■ In this case, counsel was not deficient in failing to object to the court's limiting instruction on allocution, and the Superior Court did not commit plain error in limiting Shelton's statement in allocution. This is not a case where the defendant made a specific proffer of what he proposed to say about the events on the night of the crime.[142] Indeed, Shelton's strategy before this jury would be inconsistent with such a proffer.

Before the penalty hearing, the court informed Shelton, "You can talk about yourself, your background, your upbringing, your education, your folks at home, any alcohol abuse problems, things like that."[143] These topics were relevant to any expression of remorse or mitigation of a death sentence that Shelton could have proffered. That is, the court granted

Shelton the opportunity to express contrition and to ask for leniency. Shelton chose not to exercise that right.

■ The Superior Court refused to permit Shelton to argue or discuss during allocution the facts surrounding the murder.[144] Later, at the postconviction stage, the court interpreted its own instruction: "[e]ven in allocution, he could have properly referred to the trial evidence pointing to his lack of involvement and not violated the Court's parameters."[145] The trial judge did not, however, so refine his overbroad limitation at the penalty phase. It is regrettable that he did not do so. But the argument now is about a point that is moot in this appeal. The record shows that Shelton did not want to "refer[ ] to the trial evidence pointing to his lack of involvement...."[146] Therefore, the court's overbroad statement of limitation was harmless error.

■ The limitation the court placed on Shelton's allocution did not burden impermissibly his right to present mitigating evidence because there was no proffer of what the defendant would say in arguing

---

**142.** The Superior Court first gave Shelton the limiting instruction after defense counsel raised the issue of allocution. Shelton failed to object and never told the court what he would say in allocution. Thus, under this Court's well-settled waiver rule, Shelton arguably has waived his right to challenge the trial court's ruling on allocution. *See Eustice v. Rupert*, Del.Supr., 460 A.2d 507, 511 (1983) ("Failure to object to erroneous statements of the law or inaccurate statements of the facts ... is evidence of waiver."). In fact, Shelton not only failed to object, he assented to the court's limitation. That is, Shelton's failure to object was not the result of oversight or neglect. Rather, it was Shelton's deliberate strategy to limit severely what he would say in allocution. Nevertheless, where the trial court commits plain error, a failure to object does not constitute a waiver of the right to raise the issue on appeal. *See* Del.Super. Ct.Crim. R. 52; *Probst v. State*, Del.Supr., 547 A.2d 114, 119 (1988). Because the right to allocution is arguably a "substantial right" of a capital defendant, and the law of allocution is ambiguous in Delaware, we waive the waiv-

er rule and consider the merits of Shelton's argument. *See McBride v. State*, Del.Supr., 477 A.2d 174, 184 (1984) (waiving the waiver rule for question of first impression in the interests of justice and in order to provide guidance for the trial court and future litigants); *Wainwright v. State*, Del.Supr., 504 A.2d 1096, 1100 (1986); D.R.E. 103(d). Therefore, although it was incumbent upon Shelton to object to the court's limiting instruction if he believed it was an erroneous statement of the law, and he failed to do so, the plain error rule entitles Shelton to this Court's review on postconviction appeal.

**143.** Tr. at 93 (Feb. 26, 1993).

**144.** *See Zola*, 548 A.2d at 1045–46 (during sentencing phase, trial court refused defendant opportunity to make statement to the jury without waiving his right not to be a witness against himself).

**145.** *Shelton II*, Mem. Op. at 93.

**146.** *Id.*

the facts and because such a proffer would have been inconsistent with his strategy. Accordingly, neither trial nor appellate counsel acted unreasonably on an objective review of their representation under the *Strickland* standard.[147] We are faced with a very unusual case where the record reveals as plain as glass that the defendant consciously decided, after methodical questioning by the trial judge and statements on the record by his counsel, that he was not going to present mitigating circumstances.[148] Thus, it made no difference here that the trial judge issued the overbroad limitation on allocution. There was knowing acquiescence by the defendant, the ruling was directly in line with the defendant's strategy, and there was no ineffective assistance of counsel.

### (d) Lack of Prejudice to Defendant

■ It does not follow, however, that a trial judge's setting of parameters on allocution similar to this one would not be reversible error in a proper case where objection to the limitation was preserved, where there was plain error or where there was a showing of ineffective assistance of counsel and resulting prejudice to the defendant. In our view, Superior Court Criminal Rule 32(a)(1)(C) and 11 *Del. C.* § 4209(c)(2) provide a defendant in the penalty phase of a capital case the opportunity to argue in allocution from the facts already in evidence in the guilt phase or the penalty phase why those facts should not result in the death penalty. This is true whether the argument is to assert diminished responsibility, reduced culpability in comparison to other defendants, mistaken identity, mistake by the jury in finding guilt or any other reason.

That is not the case here. Had he wanted to do so, Shelton could have discussed in allocution the facts in *evidence* in the guilt phase in order to *argue* whatever he could to avoid the death penalty. The entire record shows, however, that Shelton and his counsel did not, as part of their considered strategy, desire to review before the jury the facts already in evidence from the guilt phase. In response to the trial court's statement that "he cannot discuss the events of January 11 and 12, 1992" his stand-by counsel said, "[y]our Honor, he understands that. He can't talk about any factual evidence."[149] Later that day, in addressing Shelton as a *pro se* defendant, the court said, "you can't argue about the facts .... You just can't talk about the facts surrounding the murder," to which Shelton said he understood.[150] To have "talk[ed] about the facts surrounding the murder" would have been inconsistent with his strategy of not arguing the facts and not presenting mitigating evidence for fear it would offend the jury and seal his fate.

The record of the penalty phase shows that both Shelton and his lawyer hoped that the guilt-phase evidence, which may have tended to place less culpability on Shelton than the other defendants, would rescue him from the death penalty in the eyes of the jury.[151] There is nothing in the record to show that Shelton had any inten-

---

**147.** 466 U.S. at 688, 104 S.Ct. 2052.

**148.** As the trial judge found in the postconviction proceeding:

> He felt he could not ask for mercy after the jury had found him guilty of a heinous murder. To do so, he acknowledged, would risk offending the jury and promoting a greater likelihood of a death sentence recommendation. Steven had indicated to his trial counsel and the Court that this would be his approach *prior* to the Court indicating the parameters of allocution. Thus, those parameters in no way affected

his talk to the jury. That observation is underscored by the lack of any indication of what he would have said, if no parameters existed. To put it another way, Steven cannot demonstrate actual prejudice.

*Shelton II*, Mem. Op. at 92–93 (emphasis in original). That finding is entitled to deference.

**149.** Tr. at 57 (Feb. 26, 1993).

**150.** *Id.* at 93–94 (Feb. 26, 1993).

**151.** *See id.* at 6–7; 14–16.

tion of arguing to the jury in allocution the facts of that tragic night in order to remind them that the guilt-phase evidence showed he was less culpable than the others.

▬ Shelton is unable to show that he was prejudiced by the court's limitation on allocution. He argues that the court's instruction limiting allocution had a "chilling effect" on his ability to express his feelings to the jury and that his right to allocute was prejudiced by counsel's failure to object to the court's limiting instruction.[152] We are not persuaded by this argument. The record reflects that Shelton was given three options by the Superior Court during the penalty phase: (1) to remain silent; (2) to testify broadly under oath subject to cross-examination; and (3) to allocute within the limited parameters of that right. Shelton and his counsel chose the latter course and knowingly acquiesced in the limitation.

Initially, Shelton planned to produce no witnesses at the penalty hearing.[153] Shelton told his lawyer that the killing was so horrible, nothing he could tell the jury would create enough mercy to recommend life over death.[154] Shelton also told counsel that begging for mercy would have an adverse effect on the jury and ultimately would make it more likely that they would recommend death.[155] Counsel expressed this to the court and Shelton attested to its accuracy.[156] Additionally, Shelton did not want to put his family or Mannon's family through the trauma of testifying at the penalty hearing.[157] Shelton later altered his strategy, and produced three witnesses to speak on his behalf at the penalty hearing.[158] During allocution, however, Shel-

ton did not plead for his life or argue the facts of the night of the murder.[159]

Shelton cannot show a reasonable probability that, but for the alleged ineffective assistance of counsel during allocution, the result of the penalty phase would have been different.[160] This is because the record is clear that his strategy was to curtail the mitigating evidence he would present at the penalty hearing in order to protect his family, the victim's family, and for his own tactical reasons. While discussing his request to represent himself, the following colloquy occurred between Shelton and the Court:

> Shelton: I feel that I was convicted wrongly from the evidence that was presented against me. The evidence against me, I would like for it to be presented to the jury without any mitigating evidence in my behalf, and have them come back with the guilt— with either a verdict either death or life in prison.
>
> * * * *
>
> The Court: Why is it that you think that not presenting mitigating evidence will be helpful to you?
>
> Shelton: As I stated earlier, the day before yesterday, I don't want to drag my family through this anymore. I have talked to my family, and we have all agreed that I am a competent adult and I know what I am doing, and this is my decision.[161]

Shelton's counsel, addressing the court on the same issue, stated:

---

**152.** Appellant's Op. Br. at 52.

**153.** *See* Tr. at 6–7; 10 (Feb. 26, 1993).

**154.** *See id.* at 14.

**155.** *See id.* at 14–15.

**156.** *See id.*

**157.** *See id.* at 7.

**158.** *See id.* at 55–56; *see* Tr. at 17–57 (Mar. 3, 1993).

**159.** *See* Tr. at 62–63 (Mar. 3, 1993).

**160.** *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Flamer,* 585 A.2d at 753.

**161.** Tr. at 6–7 (Feb. 26, 1993).

Counsel: Steve said to me at one point, my feeling is that this was such a grievous, horrible murder, that there is nothing I could put in front of this jury that would make them have enough mercy on me to give me life rather than death, and in fact, begging for mercy in front of this jury may have an adverse effect. They may feel that because, after being found guilty of this crime, if I come in here and plead for mercy, that may turn them off, and make them want to give me death.[162]

After a recess, Shelton informed the court that he had changed his mind and would present mitigating witnesses in support of his defense, but that he wanted to represent himself with his attorney acting only as "stand-by counsel." Thereafter, the following colloquy occurred between Shelton and the court:

The Court: If I permit you to represent yourself and you choose on your own not to present any mitigating evidence, do you understand that decision, my decision and your decision are ones that you may be stuck with on appeal, on any post-conviction remedy or at any other time?

Shelton: Yes, I do.

The Court: When I say stuck with it, you may not be able to come back—you will not be able to come back or may not be able to come back and say the Judge shouldn't have allowed me to do that. Do you understand?

Shelton: Yes.[163]

Thus, it is clear from the record in this case that Shelton was not prejudiced by the court's instruction on allocution. Shel-

ton's failure to show prejudice is fatal to his appeal.

As for Shelton's argument in this appeal that the instructions had a "chilling effect" on his ability to plea for his life, the trial court found that Shelton "had indicated to his trial counsel and the Court that this would be his approach *prior* to the Court indicating the parameters of allocution. Thus, those parameters in no way affected his talk to the jury." [164] In fact, Shelton had a strategic reason to refuse to beg for mercy: he believed that doing so would *impair* his chances of receiving a life sentence.[165] Shelton expressed to counsel, "[the jury] may feel that because, after being found guilty of this crime, if I come in here and plead for mercy, that may turn them off, and make them want to give me death." [166]

Indeed, in keeping with this strategy, Shelton twice stated in allocution that he was not pleading for his life.[167] Therefore, since speaking about the facts of the murder would have been a means of expressing remorse, and Shelton did not wish to express remorse, Shelton was not prejudiced by the court's limitation on allocution. Accordingly, we find no ineffective assistance of counsel or plain error sufficient to overturn Shelton's sentence of death.

## VI. *The Prosecutor's Closing Remarks Regarding Shelton's Lack of Remorse*

Shelton contends that the prosecutor's closing remarks in the penalty hearing regarding Shelton's lack of remorse violated his Fifth Amendment right against self-incrimination. According to Shelton, the prosecutor's comment on his lack of remorse was an indirect statement on his

---

**162.** *Id.* at 14.

**163.** *Id.* at 75.

**164.** *Shelton II*, Mem. Op. at 92–93 (emphasis in original).

**165.** *See* Tr. at 14 (Feb. 26, 1993).

**166.** *Id.*

**167.** *See* Tr. at 62–63 (Mar. 3, 1993) ("Ladies and gentlemen of the jury, I stand before you not to plead for my life .... Again, I'm not here to plead for my life, but I ask the jury to be fair in their decisions.").

failure to testify and focused the jury on an improper consideration—whether he had a duty to express remorse in order to avoid the death sentence. Shelton argues that commenting on his failure to express remorse violated his right against self-incrimination and infected the integrity and fairness of the process. Furthermore, he argues that the court's failure to issue a curative instruction on the prosecutor's improper comment was error.

Shelton failed to make this argument at trial or on direct appeal. Therefore, under Superior Court Criminal Rule 61(i)(3), he must show cause for his procedural default and prove resulting prejudice. In an attempt to do so, Shelton couches this argument in a claim of ineffective assistance of counsel. The issue arose out of the following circumstances.

Exercising his Fifth Amendment privilege to remain silent, Shelton did not testify during the guilt phase of the trial. During the penalty phase, Shelton made to the jury the following statement in allocution:

> Ladies and gentlemen of the jury, I stand before you not to plead for my life. I feel that's wrong and improper and basically disrespectful to the victim's family and to mine. The State has painted a picture, and that picture is not very pretty, pertaining to me and my co-defendants. And I would just like to present to the jury a different side or a different meaning to Steven Shelton. The State has pictured me as being a monster, as being a rapist, as being a violent individual, but as you heard from my family, that's not so. The State only presents one side of the picture. There's two sides to every story. And the State just presents a negative side.

> The jury has found me guilty of these allegations, and now it's the jury's turn to render a verdict. And that verdict is either life in jail or death. Again, I'm not here to plead for my life, but just ask the jury to be fair in their decisions. That's all I have to say.[168]

In his summation to the jury during the penalty hearing, the prosecutor said the following:

> Another thing that judges, for me, the importance of what you do and what this all means is the remorse that has been shown in this case in the words of Jack Outten in allocution and also Steven Shelton in allocution. And they told you or paid lip service that they had concerns for the families of the victim, but what did you hear about their remorse for their acts? What did you hear about that concern for the families of the victim whose life was taken innocently, without any wrong that he caused any of these individuals?[169]

Shelton argues that since he did not testify at trial, it was improper for the prosecutor to comment on his lack of remorse, because it was also an impermissible comment on his failure to testify. We disagree.

 The Fifth Amendment prohibition against self-incrimination bars a prosecutor from commenting on the defendant's failure to testify at trial or the penalty phase.[170] This rule is applicable in both the guilt and penalty phases of a death penalty trial.[171] A defendant does not waive his rights by testifying at the penalty hearing solely on mitigating factors that are wholly collateral to the merits

---

**168.** Tr. at 62–63 (Mar. 3, 1993).

**169.** Tr. at 12–13 (Mar. 4, 1993).

**170.** *Griffin v. California,* 380 U.S. 609, 614–15, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Lesko v. Lehman,* 3d Cir., 925 F.2d 1527, 1541, *cert. denied,* 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991).

**171.** *See Lesko,* 925 F.2d at 1541; *Estelle v. Smith,* 451 U.S. 454, 462–63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (discerning no basis to distinguish between the guilt and penalty phases of a capital murder trial so far as the Fifth Amendment is concerned).

of the charges against him.[172] But when a defendant allocutes at the penalty hearing, "[c]learly, then, he could not claim a Fifth Amendment privilege against cross-examination or prosecutorial comment on matters reasonably related to his credibility or the subject matter of his testimony."[173] It has been held that a prosecutor or the court may advise the jury that it may draw an adverse inference from the defendant's silence when the defendant has testified as to some facts concerning the crime charged, but has refused to testify as to other facts within his knowledge.[174] Thus, a defendant does not waive completely the Fifth Amendment privilege by testifying solely on collateral or preliminary matters.[175]

■ In determining whether the prosecutor improperly commented on the defendant's right to remain silent, the test is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."[176] In making this determination, we must examine the comments in their trial context.[177]

Since Shelton did not testify under oath during the penalty phase, he was not subject to cross-examination by the prosecutor. In allocution, Shelton stated that he had another side, one that was not violent and included the love from his family. He stated that the State had distorted the image of the true Steven Shelton by depicting him as being "a monster, ... a rapist, ... and a violent individual."[178] He asked that the jury be fair in determining his sentence and refused to plead for mercy because it would be "disrespectful" to his family and Mannon's family. During closing arguments, the prosecutor responded by directing the jury's attention to Shelton's allocution and indicated that he failed to express any remorse for his actions.

■ We agree with the Superior Court that Shelton's comments in allocution "open[ed] the door" for the prosecutor to comment on his lack of remorse.[179] The prosecutor's comments did not touch upon the charges against Shelton, nor his failure to testify at trial.[180] Taken in their context, the prosecutor's remarks followed after Shelton's statement in allocution. It is noteworthy that the prosecutor did not make these comments at the guilt phase of the trial, where the comments could be viewed as direct attacks on his right to

172. See Lesko, 925 F.2d at 1541–42.

173. Id. at 1542 (citing Harrison v. United States, 392 U.S. 219, 222, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); McGautha v. California, 402 U.S. 183, 217, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971)) ("[T]he policies of the privilege against compelled self-incrimination are not offended when a defendant in a [non-bifurcated] capital case yields to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt.").

174. See Lesko, 925 F.2d at 1542 (citing United States v. Weber, 3d Cir., 437 F.2d 327, 334 (1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971)).

175. See id. at 1543 (citing Simmons v. United States, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); United States v. Inmon, 3d Cir., 568 F.2d 326, 332 (1977); United States v. Branker, 2d Cir., 418 F.2d 378, 380 (1969)).

176. Id. at 1544 (citing Bontempo v. Fenton, 3d Cir., 692 F.2d 954, 959 (1982)); DeShields v. Snyder, D. Del., 829 F.Supp. 676, 684 (1993).

177. See Lesko, 925 F.2d at 1544 (citing United States v. Robinson, 485 U.S. 25, 31, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)).

178. Tr. at 62–63 (Mar. 3, 1993).

179. Shelton II, Mem. Op. at 95.

180. See Lesko, 925 F.2d at 1542 (holding that by providing biographical testimony during penalty phase, defendant waived his privilege against prosecutorial comment on matters reasonably related to his credibility or the subject matter of his testimony).

silence.[181] Rather, the prosecutor's comments pertained directly to the statement Shelton proffered in allocution and reflected solely on his character—that is, his failure to express remorse for his actions. Unlike *Lesko v. Lehman*, where the prosecutor commented on collateral issues that the defendant had not mentioned during the penalty phase, the prosecutor's comments in this case were not tangential to what Shelton had said in allocution. Because the prosecutor's comments were made "on matters reasonably related to [Shelton's] credibility or the subject matter of his testimony," we affirm the trial court's decision.[182]

We agree that the natural inference the jury would draw from the prosecutor's statement in this case would be that Shelton was an unfeeling man, not that he failed to testify.[183] Because the prosecutor merely commented on the statements made by Shelton in allocution, Shelton retained his right "to be free from prosecutorial comment about his failure to testify about the merits of the prosecution's case."[184] In addition, the prosecutor's comment on the element of remorse was brief and can not be read fairly as having undermined the fundamental fairness of the penalty hearing.[185] Thus, the prosecutor did not infringe upon Shelton's Fifth Amendment right to silence by commenting on Shelton's lack of remorse in allocution.

As a result, defense counsel was not deficient in failing to object to the prosecutor's statement during closing arguments.[186] In any event, Shelton has failed to prove that, but for counsel's alleged error, the result of the penalty hearing would have been different. Shelton argues that "[t]he prejudice from counsel's ineffectiveness is that the jury was left with the impression that Shelton was not remorseful for the death of the victim, thereby increasing the probability that he would receive the death sentence."[187] We are not persuaded by this conclusory argument. The prosecutor's comment was but a few lines of 27 pages of transcript. Shelton has failed to show how an objection from counsel would have changed the jury's recommendation of death.

---

181. *But see Jackson v. State*, Del.Supr., 643 A.2d 1360, 1378–80 (1994) (statement about defendant's lack of remorse during closing arguments of guilt phase was harmless error beyond a reasonable doubt).

182. *Lesko*, 925 F.2d at 1542; *see also McNelton v. State*, 111 Nev. 900, 900 P.2d 934, 936–37 (1995) (citing *United States v. Lopez–Alvarez*, 9th Cir., 970 F.2d 583, 595–96 (1992) (prosecutor may comment on defense's failure to present exculpatory evidence, as long as that comment is not phrased to call attention to defendant's failure to testify)); *see also Gaskins v. McKellar*, 4th Cir., 916 F.2d 941, 951 (1990); *Six v. Delo*, E.D. Mo., 885 F.Supp. 1265, 1284–85 (1995), *aff'd*, 8th Cir., 94 F.3d 469, 476–77 (1996), *cert. denied*, 520 U.S. 1255, 117 S.Ct. 2418, 138 L.Ed.2d 182 (1997); *People v. Davenport*, 11 Cal.4th 1171, 47 Cal.Rptr.2d 800, 906 P.2d 1068, 1097 (1995).

183. *See McNelton*, 900 P.2d at 936–37; *Lesko*, 925 F.2d at 1544.

184. *Lesko*, 925 F.2d at 1543.

185. *See Jackson*, 643 A.2d at 1379 (citing *People v. Hovey*, 44 Cal.3d 543, 244 Cal.Rptr. 121, 749 P.2d 776, 797 (1988); *Henderson v. Dugger*, 11th Cir., 925 F.2d 1309, 1318 (1991)).

186. Shelton also argues that defense counsel rendered ineffective assistance in failing to request a curative instruction that the jury "may not infer lack of remorse from the defendant's failure to testify" and that the jury should "disregard the prosecutor's comments suggesting Shelton's lack of remorse." Appellant's Op. Br. at 69–70. We have stated above that Shelton's underlying substantive claim on the issue of prosecutorial misconduct is without merit. Thus, trial counsel had no reason to request a curative instruction because the prosecutor had not commented impermissibly about Shelton's failure to testify on the merits of the prosecution's case. *See Lesko*, 925 F.2d at 1543. Shelton is unable to prove that counsel was deficient because the Sixth Amendment does not require counsel to pursue meritless arguments before a court. *See Flamer*, 585 A.2d at 758.

187. Appellant's Op. Supplemental Br. at 14.

## VII. Ineffective Assistance of Counsel During the Penalty Phase

Shelton contends that counsel rendered ineffective assistance during the penalty phase by failing adequately to prepare and investigate mitigating evidence. He argues that counsel failed to investigate evidence of his family history, social background, and psychiatric condition. According to Shelton, had counsel thoroughly prepared and investigated, counsel would have discovered useful mitigating evidence that would have supported a life sentence instead of death.

"In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." [188] In evaluating Shelton's claim for ineffective assistance of counsel, we must take care "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." [189] In making this determination, we recognize that "counsel is presumed to have rendered adequate assistance" and that counsel has exercised the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." [190]

Defense counsel has a general duty to "investigate potentially mitigating evidence for use at the penalty stage." [191] This duty does not demand that counsel pursue "all lines of investigation," nor does it require the presentation of all potentially mitigating evidence, or even all mitigating evidence uncovered. [192] That other witnesses might have been available, alone, is insufficient to prove ineffective assistance of counsel. [193] This Court will not "speculate on what testimony these other witnesses might have presented." [194] "Counsel can make reasonable choices" and focus his or her investigation on what might best convince a jury not to impose the death penalty. [195]

In light of our standard, we conclude that Shelton's claims are without merit. Defense counsel did investigate and prepare mitigating evidence, interviewing Shelton's family and intending to present evidence of his family history. [196] But from early on in the penalty phase, Shelton made a deliberate strategic decision to limit the mitigating evidence that he would present. Shelton cannot now claim counsel acted unreasonably when Shelton clearly had proscribed the parameters of his defense. [197]

### (a) Counsel's Alleged Failure to Investigate Adequately Mitigating Evidence.

Shelton argues that a postconviction investigation of his past revealed "substantial potential mitigating factors which trial counsel was unaware of due to his failure to adequately prepare." [198] In support of this claim, he provides psychiatric reports, opinions from outside counsel, and a comprehensive psychosocial investigation of his background, school performance, and

**188.** *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

**189.** *Id.* at 689, 104 S.Ct. 2052.

**190.** *Id.* at 691, 104 S.Ct. 2052.

**191.** *Flamer,* 585 A.2d at 756.

**192.** *Id.* at 756–57.

**193.** *Id.* at 756.

**194.** *Id.*

**195.** *Id.*

**196.** Tr. at 12–13 (Feb. 24, 1993).

**197.** *See Amos v. Scott,* 5th Cir., 61 F.3d 333, 349 (1995) (no ineffective assistance of counsel when counsel failed to investigate background and character because defendant had insisted that no witnesses would testify at penalty phase).

**198.** Appellant's Op. Br. at 63.

prior criminal history.[199] He contends that defense counsel improperly limited his investigation to discussions with his family members, who were ill-equipped to provide sufficient mitigating evidence. As a result, Shelton argues, he was unable to make a strategic decision on the presentation of mitigating evidence because defense counsel failed to conduct a reasonable investigation of such pertinent factors.

At the outset, we find no merit in this argument because it was Shelton who demanded that counsel not explore mitigating evidence for the penalty hearing. In fact, if Shelton had it his way, he would have had neither the benefit of counsel nor the opportunity to present any mitigating evidence during the penalty hearing. Contrary to his argument, it is trial counsel and the court whom Shelton should credit for convincing him to present mitigating evidence in the first place. We are struck by the irony that Shelton now blames counsel for the paucity of mitigating evidence explored and presented.

In reviewing Shelton's motion for post-conviction relief, the Superior Court conducted an exhaustive 56–page analysis of Shelton's claim that trial counsel rendered ineffective assistance in preparing for the penalty phase.[200] As the Superior Court noted, the trial record is replete with testimony showing that Shelton made a deliberate strategic decision to limit the mitigating evidence he would present at the penalty hearing.[201] We have reviewed that analysis and do not find any error in it.

In addition, immediately after the jury rendered its guilty verdict on February 23, 1993, Shelton expressed his desire to terminate counsel's assistance and sought to represent himself.[202] Only on February 26, 1993, after a series of discussions among Shelton, counsel and the court, did Shelton change his mind and allow counsel to continue representation as "stand-by counsel." [203] On the day preceding the penalty hearing, Shelton again changed his mind and requested that trial counsel continue representation, provided that counsel "do his wishes." [204] Nevertheless, Shelton made it clear that he ultimately controlled the scope of his defense during the penalty hearing.

On February 24, 1993, after the jury rendered its verdict and Shelton fired trial counsel, the following colloquy occurred:

The Court: Mr. Willard, independent of your client's wishes in connection with whether to present mitigating evidence or not to present mitigating evidence, have you done any investigation regarding presenting mitigating witnesses?

Mr. Willard: Yes, I have, Your Honor.

The Court: Can you describe for me what you've done?

Mr. Willard: Well, Your Honor, I've just spent the last three and a half hours with his family, his mother and his sister. They were my original plan. They are two witnesses that I originally intended to call in his behalf.

The Court: What were they going to say?

Mr. Willard: Your Honor, they were going to talk about his life, what kind of kid he was, what kind of upbringing he's had, all the difficulties in his life, what kind of a family...

The Court: I'm sorry. I have to make a record.

**199.** See items (16)–(21) in Parts II & III of Defendant's Appendix.

**200.** See Shelton II, Mem. Op. at 97–151.

**201.** See id. at 99–115; Tr. at 11–56 (Feb. 24, 1993); Tr. at 6–28, 41–42, 55–101 (Feb. 26, 1993); Tr. at 2–23 (Mar. 1, 1993); Tr. at 58–62 (Mar. 3, 1993).

**202.** See Tr. at 11–12 (Feb. 24, 1993).

**203.** Tr. at 88 (Feb. 26, 1993).

**204.** Tr. at 2 (Mar. 1, 1993). Shelton instructed that counsel would perhaps call one witness and give closing argument. See id.

Shelton: It's none of your business what my family has to say in my behalf.

The Court: I have to make a record. Numerous court opinions have made that quite clear. What would they have gone into [to Steven's trial counsel]?

Mr. Willard: Your Honor, his childhood, his upbringing, his life, their relationship with him.

The Court: Based on your discussion with them, were there any other witnesses or areas that you might have wanted to explore such as schooling or things like that?

Mr. Willard: Nothing like that, Your Honor, no. There would be a real strong possibility that if I had my way, if my client would have so allowed me, I would be calling also his nieces.

The Court: For what purpose?

Mr. Willard: And perhaps his stepbrother for the same reason, Your Honor, to show the family relationship, their love for him.

The Court: Are they all available; mother, sister, nieces and step-brother?

Mr. Willard: Your Honor, his sister who was present in [the] courtroom until half an hour ago, Your Honor, when we finally broke, she advises me that she has discussed the possibility of her children testifying with her husband and that he has tentatively agreed to that. I didn't discuss with them a day possibly because I, quite frankly, don't know when my time would come exactly. They would have to make arrangements for schooling and so forth, but it's my understand-ing that in all likelihood the nieces would be called.[205]

As the colloquy continued, counsel and the court discussed counsel's investigation and plans for mitigating witnesses. Counsel made it clear to the court that Shelton instructed him "not to talk to his mother and not to talk to his sister."[206] Counsel also informed the court that Shelton "wants to remove himself from those people. He does not wish to have them be put in here and be put through this. That's his sincere and honest wishes, Your Honor."[207] Shelton told the court that he understood that the failure to present mitigating evidence could increase the chances of a death sentence.[208]

Despite Shelton's desire to present no mitigating evidence, the next day counsel provided the State with a letter setting forth 43 mitigating circumstances, as required by 11 *Del. C.* § 4209(c).[209] On February 26, 1993, the court discussed the contents of the letter with Shelton. Shelton told the court he had reviewed the letter and that he understood that by not presenting mitigating evidence, none of the issues in the letter would be presented to the jury.[210]

The February 25, 1993 letter further convinces us that defense counsel thoroughly prepared for the penalty hearing. The letter sets forth an extensive list of factors that could be used to mitigate the death sentence, but for Shelton's insistence that he control and limit the mitigating evidence presented on his behalf.

On March 1, 1993, the day the penalty hearing was to begin, Shelton and defense counsel informed the court that Shelton had changed his mind and that he wanted counsel to continue to represent him

---

**205.** Tr. at 11–14 (Feb. 24, 1993).

**206.** *See id.* at 15–16.

**207.** *See id.* at 16.

**208.** *See id.* at 25–26; Tr. at 69 (Feb. 26, 1993).

**209.** Letter dated February 25, 1993. *Shelton II,* Mem. Op. at n. 16.

**210.** *See* Tr. at 81 (Feb. 26, 1993).

through the penalty hearing.[211] Nevertheless, Shelton retained the right to instruct counsel on which witnesses he would call and which questions to ask and not to ask.[212] Before the penalty hearing commenced, the following colloquy occurred:

> The Court: [Trial counsel] has indicated there are some matters of the forty-three he listed in his letter of potential mitigating circumstances here, mitigating factors, that you do not want some of them presented to the jury. Is that correct?
>
> Shelton: That's correct.
>
> The Court: And you would like him to stay in this case as our attorney, and have him represent you, but on the condition that you be able to decide to present certain of those matters but to not present other matters. Is that correct?
>
> Shelton: That is correct. Only what I instruct him to bring up is basically all that I would want him to bring out. I understand [trial counsel]'s position against the death penalty, and I respect that decision, as he respects my decision, and I feel that I'm not doing nothing unethical in his belief as far as his representation of me.
>
> The Court: How, if you retain the right to not present some or any, shall we say, of the forty-three items he's listed in the letter, okay, do you understand that you may or you are—may be or you are keeping from the jury and from me certain potential mitigating factors?
>
> Shelton: I understand that completely.
>
> * * * *
>
> The Court: And do you understand that in the weighing process, that could harm you in terms of the jury's decision and my decision?
>
> Shelton: Yes, I do.
>
> The Court: And do you understand that the harm could be a death sentence?
>
> Shelton: I understand that.[213]

Three witnesses ultimately testified on Shelton's behalf: his older half-brother, Edward, a half-sister, Dorothy, and a half-sister, Louise. Combined, they described a very dysfunctional family, physical and mental abuse by the father, the father's severe industrial accident, the father's long-standing alcoholism, and many other family problems. There was testimony about Shelton's trouble in school, difficulty coping in a mixed racial neighborhood, and his many fights. According to the witnesses, Shelton's father was the reason Shelton began drinking at a very early age.

These witnesses also described the positive side to Shelton's life. Namely, they testified as to Shelton's happy early childhood and several pleasant family experiences. Louise described how in 1991 Shelton had visited her and her children and how they had favorably responded to the affection he showed them. Louise described repairs he did for her older sister. They commented on how Shelton lived with his mother and helped her with the bills.

We agree with the Superior Court that Shelton's claim of ineffective assistance of counsel is without merit. Shelton's strategy, which he had planned for months, significantly limited the scope of trial counsel's investigation during the penalty hearing. Ironically, it appears that trial counsel was the only reason that Shelton presented the mitigating evidence that he did. Therefore, given his strategy, Shelton now has no basis to argue ineffective assistance of counsel during the penalty phase.[214]

---

211. *See* Tr. at 2–3 (Mar. 1, 1993).

212. *See id.* at 4.

213. *Id.* at 19–22.

214. *See Amos,* 61 F.3d at 349 (rejecting post-conviction claim for ineffective assistance of counsel where defendant insisted that no witnesses testify at penalty hearing).

Accordingly, we are not persuaded by the reports and records that Shelton now offers on post-conviction appeal.[215] While they contain substantial information that might have been useful in preparing for the penalty phase, the record is clear that Shelton did not desire, nor allow, counsel to pursue those avenues. The Superior Court correctly summarized the situation as follows:

Steven placed significant limitations on trial counsel on what he wanted presented. At first he was not going to present any mitigating evidence. As the record shows, this decision was not rash. He had thought about it for months. Steven had decided that if convicted, he would not present any evidence, not "beg for mercy" and take his chances with the jury and the Court.

Steven had communicated this decision to trial counsel months before the guilty verdict. Trial counsel strongly disagreed with it, in part, because of his personal opposition to the death penalty. Steven knew this.

In other words, while it has been argued that trial counsel, out of professional prudence, should have prepared for the penalty hearing before trial (guilt phase), it is undisputed that long before the trial Steven had hamstrung trial counsel's approach to the penalty hearing. He did not even want his family to testify.

\* \* \* \* \* \*

Steven placed clear limitations on trial counsel, but while disagreeing with his limitations, the Court was more than satisfied Steven knew what he was doing. The Court was also satisfied that Steven appreciated the increased risk created in proceeding as he had told counsel he wished. Even after he relented and allowed counsel to remain and put on several family members, he still restricted witnesses and questioning.

Thus, this Court is not prepared to say trial counsel's actions were the result of a lack of due diligence. Clearly, Steven significantly limited trial counsel's ability to present witnesses and the approach to be taken at the penalty hearing. Steven had originally decided months before the trial that if he were found guilty, he did not want to present any mitigating evidence. He told trial counsel this, who vigorously disagreed with Steven's approach. Only just before the penalty hearing began did Steven relent but then only so slightly. He is not and should not be in a position to now argue that trial counsel should have done more.[216]

Shelton has failed to prove that trial counsel acted unreasonably in investigating and preparing for the penalty phase. Therefore, we need not consider how counsel's alleged ineffective assistance would have prejudiced Shelton.[217]

### (b) Ineffective Assistance of Counsel in Failing to Secure Psychiatric Witnesses

Shelton makes the related argument that trial counsel rendered ineffective assistance in failing to secure psychiatric witnesses and to conduct a psychiatric report. In support of his claim, Shelton provides the Court with two psychiatric reports from Jeffrey Janofsy, M.D., and David Schretlen, Ph.D.

Shelton must prove that counsel acted objectively unreasonably in failing to order psychiatric evaluations and that Shelton suffered resulting prejudice. We find on this record that trial counsel acted in a professionally reasonable manner in failing to call expert psychiatric witnesses and to conduct a psychiatric report. Furthermore, we find that Shelton suffered no

---

**215.** See items (16)–(21) in Parts II & III of Defendant's Appendix.

**216.** *Shelton II,* Mem. Op. at 111–113.

**217.** *See Flamer,* 585 A.2d at 747–48.

prejudice as a result of counsel's alleged deficiency.

Shelton argues that his situation is analogous to that in the case of *State v. Wright*, in which the Superior Court, after viewing the totality of the circumstances surrounding the legal representation at the penalty phase, ruled that the "almost complete lack of investigation into Wright's mental, school, and family history . . . in addition to [counsel's] lack of strategy in presenting mitigation evidence in the penalty phase," constituted ineffective assistance of counsel.[218] In *Wright*, the court held that counsel had rendered ineffective assistance because counsel's summation was easily interpreted as a plea for sympathy and lasted less than five minutes.[219] Moreover, counsel's summation contained only a brief reference to Wright's hardship as a youth and the entire penalty hearing lasted less than one hour.[220] The defense presented two witnesses, the defendant's mother and girlfriend.[221] Defense counsel, in a brief summation, made a plea for mercy, and referred to the defendant's having been born to "an unwed mother," his poverty, his failing in school, and his introduction to drugs by older children in the neighborhood.[222]

■ Shelton's situation is distinguishable. Shelton made it clear to counsel and the court that he would control and limit the mitigating evidence that would be presented on his behalf. He informed the trial court that he had deliberated his decision for months. Defense counsel was ready, willing and able to present a compelling case in favor of a mitigated sentence. Shelton's penalty hearing lasted five days. During that time, as well as at the trial, Shelton behaved rationally and intelligently and instructed the court that he was sane for purposes of his decisionmaking.[223] Never once did Shelton indicate to counsel or the court that he desired, or would permit, a psychiatric evaluation. Thus, aware of Shelton's strategy, defense counsel had no duty to order psychiatric evaluations or to prepare psychiatric witnesses for the penalty hearing.[224]

■ We hold that counsel behaved in an objectively reasonable manner in not securing an expert psychiatric witnesses and in not obtaining a psychiatric evaluation for the penalty hearing. Accordingly, we need not consider whether counsel's alleged deficiency caused Shelton prejudice.[225] Nevertheless, the psychiatric reports proffered by Shelton do not constitute conclusive proof that, but for defense counsel's alleged error, the result of the proceeding would have been different.

The reports indicate no sign of cognitive impairment. They show that Shelton is of low average intelligence whose mental abilities are consistent with his IQ. According to Dr. Schretlen, individuals with Shelton's profile "frequently are careless

---

**218.** Del.Super., 653 A.2d 288, 303 (1994).

**219.** *See id.* at 301.

**220.** *See id.* at 297.

**221.** *See id.*

**222.** *Id.*

**223.** Tr. at 39 (Feb. 24, 1993).

**224.** *See Outten,* 720 A.2d at 554 (holding defendant was aware of counsel's strategy to provide no evidence of negative behavior at penalty phase and that decision to avoid presenting psychiatric reports was reasonable) (citing *Riley v. State,* Del.Supr., 585 A.2d 719, 729 (1990) (holding it is "within defense counsel's professional judgment to forego an investigation into defendant's mental health for the purposes of mitigation," when counsel had met with defendant on numerous occasions and prepared for trial believing defendant suffered no mental impairment, and reminding that the "strategic choices made after less than complete investigation are reasonably precise to the extent that reasonable professional judgments support the limitations on investigation") (citing *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052)).

**225.** *See Flamer,* 585 A.2d at 747–48.

and irresponsible."[226] In addition, Shelton's "impulsivity, antagonism and irresponsibility" may be personality traits stemming from his childhood.[227] Both Dr. Schretlen and Dr. Janofsky noted that Shelton's parents were alcoholics and that his father physically abused his mother and siblings. Dr. Janofsky recounted Shelton's difficulty in school, his juvenile and adult criminal history, and his substance abuse. Dr. Janofsky's examination of Shelton revealed no intent or plan of suicide or threats to others; no signs of hallucinations; no thought disorder or delusions; and no obsessions, compulsions or phobias.[228] Dr. Janofsky concluded that there was no evidence of a major mental illness and that Shelton had been raised in a severely abusive environment.[229]

Neither Dr. Schretlen nor Dr. Janofsky discovered any mental illness or disease. As expected, both psychiatrists opined that Shelton suffered from behavioral and personality problems such as anger, irritability, carelessness, irresponsibility, conformity, etc. Nevertheless, the mitigating value of such diagnoses is slight, if any. Accordingly, Shelton has not shown the requisite prejudice under *Strickland* as to defense counsel's failure to secure expert psychiatric witnesses or psychiatric evaluations.

## VII. *Dismissal of Shelton's Motion for Postconviction Relief without Conducting an Evidentiary Hearing*

Shelton contends that the Superior Court abused its discretion in dismissing his motion for postconviction relief without conducting an evidentiary hearing. According to Shelton, "all issues raised by the defendant require a fact-finding hearing."[230] Shelton appears to be arguing that a postconviction evidentiary hearing should be required in all capital cases.

We review the Superior Court's denial of postconviction relief for abuse of discretion.[231] Questions of law are reviewed de novo.[232] In a postconviction proceeding, the decision whether to hold an evidentiary hearing is a determination made by the trial court.[233] As we stated in *Outten,* "While the decision to hold an evidentiary hearing in a postconviction proceeding is within the discretion of the Superior Court, in capital cases, holding such an evidentiary hearing should be the norm, not the exception."[234] If, however, it appears from the motion for postconviction relief and the record of prior proceedings in the case that the movant is not entitled to relief, then summary disposition of the motion is appropriate.[235] Given the trial judge's extensive familiarity with the background of this case, we are unable to conclude that he abused his discretion in determining that an evidentiary hearing was not necessary.

## IX. *Conclusion*

The Superior Court carefully considered Shelton's allegations, treating such claim with the gravity that it deserved in a capital case. In its extraordinarily detailed 187–page Opinion of December 22, 1997, the Court correctly determined that each of Shelton's claims was either procedurally

---

226. Rpt. of David Schretlen, Ph.D., at 4 (Apr. 20, 1996).

227. *See id.* at 5.

228. *See* Rpt. of Jeffrey S. Janofsky, M.D., at 16 (Dec. 18, 1995).

229. *See id.* at 17.

230. Appellant's Op. Br. at 74.

231. *See Outten,* 720 A.2d at 551; *Dawson,* 673 A.2d at 1190.

232. *See Outten,* 720 A.2d at 551.

233. *See* Super. Ct.Crim. R. 61(h)(1).

234. 720 A.2d at 551.

235. *See* Super. Ct.Crim. R. 61(d)(4), (h)(3); *Maxion v. State,* Del.Supr., 686 A.2d 148, 151 (1996); *Shy v. State,* Del.Supr., 246 A.2d 926, 927 (1968).

barred or without merit. Shelton has failed to demonstrate any error of law or abuse of discretion requiring reversal. Thus, we affirm the Superior Court's decision denying Shelton's request for postconviction relief and reinstating Shelton's capital sentence. We remand to the trial court for the purpose of setting a new execution date.

HARTNETT and BERGER, Justices, dissenting:

## I.

Although the right to allocution has been recognized in Delaware since colonial times, the rule announced by the majority is the first to set forth its parameters. We agree with the majority that in the allocution a defendant may discuss or argue facts in evidence without being subject to cross-examination. In addition, the majority suggests that a defendant may present new evidence during allocution if the defendant is sworn and subject to cross-examination. Shelton, however, did not have the opportunity to give an allocution under these standards. The Superior Court's instruction that Shelton could not "discuss the events of January 11 and 12, 1992," as the majority recognizes, was "overbroad" and "erroneous." Nonetheless, the majority finds no prejudicial error because it decides that Shelton acquiesced in the improper limitation on his right of allocution.

We do not agree with the majority's restrictions on allocution or its finding of lack of prejudice. A defendant facing the death penalty should be allowed to plead for his life in whatever way he chooses, restricted only by issues of undue length, relevance, and courtroom demeanor.[236] The United States Supreme Court has not yet resolved the split in federal authority on the question of whether allocution is a right protected by the United States Constitution, and the majority in this opinion holds that the right to allocution is not protected by either the Federal or Delaware Constitution. As will be discussed, we believe that the better view is that allocution is so fundamental to a fair trial in a capital case that deprivation of that right violates both State and Federal Constitutional due process.[237]

We are not persuaded that the judge and jury need to be protected from the unsworn testimony of a convicted defendant. We are not convinced that it would be unfair to the State if a defendant, who did not testify in the guilt phase, were to offer an explanation for his conduct during allocution. Such a limitation seriously restricts a defendant's ability to express himself at the most crucial time in his life.[238] The restriction is unwarranted because it is based on an unfounded fear that a defendant who is not subject to cross-examination at the penalty phase will be able to deceive both the jury and the judge if allowed to deny guilt or otherwise explain his conduct as part of a plea for leniency. There is no empirical support for this concern. To the contrary, the results in other Delaware murder trials indicate that such self-serving statements have been unsuc-

**236.** *See Dawson v. Delaware,* 503 U.S. 159, 167, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992) ("We have held that a capital defendant is entitled to introduce any relevant mitigating evidence that he proffers in support of a sentence less than death.")

**237.** *See Dawson,* 503 U.S. at 167, 112 S.Ct. 1093; *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961); *Jackson v. State,* Del.Supr., 643 A.2d 1360, 1379 (1994) ("The Fifth Amendment privilege [against self-incrimination] applies both at trial and during a capital sentencing hearing. A

person cannot be penalized for exercising his Fifth Amendment privilege.") (citations omitted), *cert. denied,* 513 U.S. 1136, 115 S.Ct. 956, 130 L.Ed.2d 898 (1995); *Osburn v. State,* Del.Supr., 224 A.2d 52, 53 (1966) (recognizing that due process requires that a judge have an open mind as to the sentence to be imposed, at least to the extent of receiving all information bearing on the question of mitigation).

**238.** *See Dawson,* 503 U.S. at 167, 112 S.Ct. 1093.

cessful. In other capital cases in Delaware, different trial judges have allowed defendants to plead for mercy by denying responsibility for the crime.[239] Yet the jury recommended, and the court imposed, the death penalty.[240] Additionally, the State has the right to present evidence to rebut any statements made by a defendant during allocution.[241]

The limitation on allocution imposed by the majority also presents severe practical problems. While the majority permits a defendant to argue "from the facts already in evidence" that the jury made a mistake in finding him guilty, if the defendant did not testify he must choose his words very carefully. It would appear to be permissible for the defendant to say, "You shouldn't have found me guilty" but impermissible for the defendant to say, "I didn't do it" or "I didn't mean to do it." It is sometimes difficult for attorneys, trained in the law, to precisely limit their arguments to those subjects that are permitted by the court. A defendant with a limited education, facing the death penalty, would find it almost impossible to draw these fine linguistic distinctions. The majority's formulation clearly and impermissibly prevents a defendant from expressing his constitutional right to fully state the reasons why he believes he should not be executed.

## II.

The right to speak at the allocution is an ancient fundamental common law right which has been recognized in Delaware and elsewhere for centuries.[242] It has particularly serious ramifications in the second phase of a first degree murder trial where the sole issue is the life or death of the defendant.[243] We find the majority's citation of the order in *DeShields v. State* unpersuasive.[244] The holding in *DeShields* was limited to whether the defendant could waive his right to allocution and anything else in the Order is dicta.[245] *DeShields* cited *Hill v. United States* that was a noncapital case and was limited to "[t]he failure of a trial court to ask a defendant *represented by an attorney* whether he [had] anything to say before sentence

**239.** See *State v. Barrow*, Del.Super., 1998 WL 733212 (1998); *State v. Zebroski*, Del.Super., 1997 WL 528287 (1997); *State v. Ferguson*, Del.Super., 1995 WL 413269.

**240.** We point out the result in other capital cases to demonstrate that an unrestricted allocution will not undermine the integrity of the trial. The fact that other defendants have been unable to avoid the death penalty does not mean that Shelton should not have been given the same opportunity.

**241.** See *Dawson*, 503 U.S. at 167, 112 S.Ct. 1093 ("But just as the [capital] defendant has the right to introduce any sort of relevant mitigating evidence [in support of a sentence less than death], the State is entitled to rebut that evidence with proof of its own.") (citations omitted).

**242.** See *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961); *Ball v. United States*, 140 U.S. 118, 129–30, 11 S.Ct. 761, 35 L.Ed. 377 (1891); *Schwab v. Berggren*, 143 U.S. 442, 446–47, 12 S.Ct. 525, 36 L.Ed. 218 (1892); *United States v. Behrens*, 375 U.S. 162, 165, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963) ("It is [at sentencing] that the right of the defendant to be afforded an opportunity to make a statement to the judge in his own behalf is of most importance. This right, ancient in the law, is recognized by Rule 32(a) of the Federal Criminal Rules, which requires the court to 'afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment.'"); *Hooks v. State*, Del.Supr., 429 A.2d 1312, 1313 (1981); Paul W. Barrett, *Allocution*, 9 Mo. L.Rev. 115 (1944); and cases cited in footnotes 103–106 of this opinion. Delaware has also adopted Rule 32(a).

**243.** See *Jackson v. State*, 643 A.2d at 1374; *Lockett v. Ohio*, 438 U.S. 586, 604–05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ("The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.").

**244.** *DeShields v. State*, Del.Supr., 633 A.2d 369 (1993) (ORDER).

**245.** *Id.*

[was] imposed."[246] Furthermore, in *Hooks v. State,* this Court found:

> The norms governing sentencing proceedings are well settled: thus, (1) a defendant has a right to be present at the imposition of final sentence; (2) he has a right to counsel at that time; (3) the Trial Judge is required to address a defendant personally at that time and to ask him if he wishes to make a statement in his own behalf and/or to present any information in mitigation of punishment. Those norms, whether derived from the common law or constitutionally based, are followed in our practice and are codified in Superior Court Criminal Rules 43 and 32(a). We have no doubt that the imposition of sentence is a critical stage in the proceeding and, for that reason, both defendant and counsel are required to be present.[247]

This Court has recognized that, because of the critical importance of sentencing (even in a non-capital case), it would violate constitutional due process for a trial court to decide the appropriate sentence to be imposed without the judge hearing all mitigating information:

> [The trial judge's closed mind] was a violation of the intent, purpose and spirit of Criminal Rule 32(a) which requires, by necessary implication, that before finally reaching a decision as to sentence, the sentencing judge have an open mind at least to the extent of *receiving all information bearing on the question of mitigation.* Cf. *Green v. United States,* 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670.

We think it not improper for a sentencing judge to mount the bench with some preconceived notion about the proper sentence to be imposed, but we think it quite improper for him at that point to have closed his mind upon the subject. When such is the case, due process is lacking and the sentence must be struck and the cause remanded for the imposition of sentence in the proper fashion.[248]

Despite the provisions of Superior Court Criminal Rule 32(a)(1),[249] the trial court here, prior to the allocution, stated to Shelton's counsel: "He can't get into—if he's speaking in allocution, *he cannot discuss the events of January 11 and 12, 1992.*"[250] Later the trial court, in addressing Shelton, who was then *pro se,* stated:

> Whether you want to—you can't argue about the facts. You can talk about yourself, your background, your upbringing, your education, your folks at home, any alcohol abuse problems, things like that. You can talk about all those things as much as you want. *You just can't talk about the facts surrounding the murder.* Do you understand that?[251]

Finally, right before Shelton began his allocution, the trial court again reminded him:

> You do understand the basic ground rules here, speaking on your own behalf?
>
> You are, in speaking in that manner, not in a position where you can be cross-examined, *so you can't get into the facts*

**246.** *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962) (emphasis added).

**247.** *Hooks v. State,* Del.Supr., 429 A.2d 1312, 1313 (1981) (citations omitted) (footnote omitted).

**248.** *Osburn v. State,* Del.Supr., 224 A.2d 52, 53 (1966) (emphasis added).

**249.** Superior Court Criminal Rule 32(a)(1) provides: "Before imposing sentence, the court shall also—... (c) Address the defen-

dant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence."

**250.** Tr. at 57 (Feb. 26, 1993) (emphasis added).

**251.** Tr. at 93–94 (Feb. 26, 1993) (emphasis added).

*of the offense, as such, or other general matters of that nature.*[252]

The modern purpose of allocution is to provide a defendant with the opportunity to refute or explain information previously presented and to express remorse and plead for leniency.[253] The trial judge's limiting instructions to Shelton necessarily had a chilling effect that prevented Shelton from exercising his fundamental right to reasonably express himself and present "any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[254]

### III.

We do not understand how Shelton can be deemed to have acquiesced in, and therefore suffered no prejudice from, the erroneous allocution instructions repeatedly given to him and his attorney. The record clearly demonstrates that Shelton was confused and upset after the guilty verdict. Facing death, he three times changed his position on how he wanted to handle the penalty phase. First, Shelton told the court he wanted to represent himself because his attorney opposes the death penalty:

Well, I did a little research on a few cases that you put in front of the Court or put out there. And it states in State versus Deere that it would be, for the defense counsel to keep representing me, it would be an ethical conflict to my wishes, meaning that my attorney opposes the death penalty, and if it's imposed or since we're going through, my attorney opposes it, and if the jury comes back with the death penalty, you

know, I just feel that it's unethical for him to represent me since I am facing the death penalty now. That's my opinion and that's how I feel.[255]

At that point, Shelton also intended to present no mitigating evidence because he believed the jury had already heard all the evidence and because he did not want to drag his family through the trial anymore.

After a recess, Shelton's attorney advised the court that Shelton had changed his position:

My client's position has changed somewhat, your Honor. He wishes first to continue to represent himself at the penalty phase hearing. Secondly, he's asked that I call and have available to him those certain witnesses that I had mentioned to him who would be available for possible testimony as to mitigation. He will decide which of those he will call, if any of them, when his turn comes, and that will be determined on what goes before him.

Secondly, he asked that in my position of assisting him, that I be able to give closing argument to the jury and argue my position on—against the death penalty because he feels that I can do that better than he could. And he reserves, your Honor, most particularly and first and most importantly his right to allocution. He has indicated to me that he's prepared to take the stand and make a statement to the jury, with or without having called witnesses, and that he understands that he has a right to allocution without cross-examination.[256]

Following a weekend recess, Shelton changed plans for a third time. He recon-

---

**252.** Tr. at 60 (Mar. 3, 1993) (emphasis added).

**253.** *See Thanos v. State,* 330 Md. 77, 622 A.2d 727, 732 (1993) and cases cited in footnotes 113–121 of this opinion.

**254.** *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ("[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all

but the rarest kind of capital case, not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and *any of the circumstances of the offense* that the defendant proffers as a basis for a sentence less than death.") (footnotes omitted) (emphasis added).

**255.** Tr. at 4–5 (Feb. 26, 1993).

**256.** *Id.* at 55–56.

sidered his decision to represent himself in light of the trial judge's comments to the effect that a person who represents himself has a fool for a client. As the penalty phase was about to begin, Shelton requested that his attorney represent him, with the understanding that Shelton would have the final say on matters such as who would be called as mitigating witnesses and how they would be questioned. At that point, Shelton planned to have only one mitigating witness who would be asked very few questions.[257] In the end, Shelton's attorney called three mitigating witnesses and questioned them much more thoroughly than would have been expected based on the earlier representations to the court.

Throughout these strategic developments, two things remained constant: Shelton wanted to convince the jury and judge that he should be sentenced to life, instead of death, and he wanted to speak in allocution. The majority ignores the fact that Shelton had a right to change his strategy and finds acquiescence from the simple fact that both Shelton and his attorney said they understood what the judge was stating when he improperly limited the scope of allocution. Certainly, Shelton was in no position to argue the law, and his attorney inexplicably failed to protect his client by objecting to the improper limitation on what Shelton could say in allocution. Their responses do not demonstrate acquiescence, only obedience to the dictates of the judge. The three options given to Shelton during the penalty phase were: (1) to remain silent; (2) to testify broadly under oath subject to cross-examination; and (3) to allocute *within the limited parameters* of that right. Shelton therefore faced an impossible choice be-

cause his right to allocution was, as the majority concedes, impermissibly limited by the judge. Nor would an expanded allocution have been inconsistent with Shelton's strategy of not arguing the facts and not presenting mitigating evidence for fear it would offend the jury and seal his fate. Shelton *did* the best he could under the imposed limitations in presenting mitigating evidence after his strategy changed. If he had been allowed to speak freely about the facts surrounding the murder, Shelton's allocution undoubtedly would have been different.

Finally, the majority focuses on Shelton, while acting pro se, not having made a sophisticated objection to the allocution limitations and thus not having suffered any prejudice. We cannot accept such an approach in a capital case. This Court cannot predict how the jury or judge would have reacted to the "halting eloquence"[258] of an unrestricted allocution statement, no matter how it might have differed from the limited one that Shelton gave. This is not a question of admissibility of evidence. It is a question of whether Shelton lives or is executed,[259] and a convicted murderer's plea is critical to the jury's recommendation as to the penalty. Denying Shelton the reasonable right to express himself as he desired was clearly prejudicial and unconstitutional.

Further, the prosecutor exacerbated the prejudice to Shelton when he commented on Shelton's lack of remorse.[260] Clearly, it was difficult or impossible for Shelton to have appeared to be remorseful when he could not even "discuss the events of January 11 and 12, 1992."

257. *See* Tr. at 2–9 (Mar. 1, 1993).

258. *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961) ("The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.").

259. " '[D]eath as a punishment is unique in its severity and irrevocability.' Therefore,

'the Eighth Amendment requires increased reliability of the process by which capital punishment may be imposed.' " *Jackson v. State*, 643 A.2d at 1374 (citations omitted).

260. *See Jackson v. State*, 643 A.2d at 1379–80 (cautioning against commenting on a defendant's failure to testify as showing a lack of remorse).

We would reverse as to the penalty imposed and remand for a new penalty hearing.

We, therefore, respectfully **DISSENT.**

## APPENDIX A

### Selected Portions from Pages 4–94 of Transcript of Penalty Phase Proceedings
### February 26, 1993
### Jerome O. Herlihy, J.

THE COURT: Mr. Steven Shelton, .... Is it still your desire to represent yourself in the penalty phase and not have Mr. Willard be your attorney in that penalty phase?

STEVEN SHELTON: Yes.

THE COURT: You hesitated slightly before answering yes.... Can you well me why?

STEVEN SHELTON: Well, I did a little research on a few cases that you put in front of the Court or put out there. And it states in State versus Deere that it would be, for defense counsel to keep representing me, it would be an ethical conflict to my wishes, meaning that an attorney opposes the death penalty, and if it's imposed or since we're going through, my attorney opposes it, and if the jury comes back with the death penalty, you know, I just feel that it's unethical for him to represent me since I am facing the death penalty now. That's my opinion, and that's how I feel.[1]

\* \* \* \* \* \*

THE COURT: You are not asking for the death penalty, correct?

STEVEN SHELTON: No, I'm not.

THE COURT: Tell me again why you think, since you are not asking for the death penalty, why you think Mr. Willard should not do anything on your behalf and should not represent you, as best you can in your own words, and take your time.

STEVEN SHELTON: Right. I feel that I was convicted wrongly from the evidence that was presented against me. The evidence against me, I would like for it to be presented to the jury without any mitigating evidence in my behalf, and have them come back with the guilt—with either a verdict either death or life in prison.

THE COURT: Excuse me for one moment. What you are saying is that you— are you saying that you would like to take your chances with this jury—I'll put it in other words and just let me see if I understand what your thoughts are. If I'm wrong, tell me I'm wrong. Are you saying that you would like to take your chances with this jury, first because they've already heard all the evidence as far as the guilt phase—correct?

STEVEN SHELTON: True.

THE COURT: —and there will be no other evidence regarding that in most respects, and you want to have them make up their minds and make their recommendations to me, and also, you want me to make up my mind based in effect on the evidence during the guilt phase of the trial? Is that correct?

STEVEN SHELTON: That is correct.

THE COURT: Why is it that you think that not presenting mitigating evidence will be helpful to you?

STEVEN SHELTON: As I stated earlier, the day before yesterday, I don't want to drag my family through this anymore. I have talked to my family, and we have all agreed that I am a competent adult and I know what I am doing, and this is my decision.[2]

\* \* \* \* \* \*

THE COURT: Do you think that your decision to ask Mr. Willard to step aside or me have him step aside and also not present any evidence—

---

**1.** Tr. at 4–5 (Feb. 26, 1993).

**2.** Tr. at 6–7 (Feb. 26, 1993).

STEVEN SHELTON: Mitigating evidence?

THE COURT: Mitigating evidence, evidence to help you get a life sentence.

STEVEN SHELTON: Right.[3]

\* \* \* \* \* \*

STEVEN SHELTON: I feel that I shouldn't bring any mitigating evidence in my behalf. That's my decision, and I'm going to stand with it.

THE COURT: Other than your concern for your family, why?

STEVEN SHELTON: That's just my personal decision, and that's as far as I'm going to go with that.[4]

\* \* \* \* \* \*

THE COURT: [To Mr. Willard, Steven Shelton's counsel]. I understand that you feel, in light of Mr. Shelton's expressed wishes not to have you represent him and not to put anything on, you now feel an ethical obligation to go along with his wishes?

MR. WILLARD: Correct, your Honor, so we're clear on that.

Now, your Honor, you asked Mr. Shelton about his family and their wishes. I have spoken with his mother, two or three of his sisters, extensively, and all of them have stated to me that it tears their heart to understand what could happen to Steve and that he could get a death sentence. However, they absolutely respect his wishes, and they're in agreement with it because they have expressed to me that it is, after all, his life.[5]

\* \* \* \* \* \*

I have advised them on my first meeting that it is a possibility that your Honor could order me as an officer of this Court to present mitigating evidence, and that I would therefore call them to discuss with me the things that we spoke of over many, many hours in my office about his childhood and his upbringing and the kind of things that I believe would be mitigating in his behalf. They have expressed to me the thought that they perhaps would not honor my wishes and come in voluntarily, and that if they were subpoenaed, they perhaps would disregard a subpoena because they feel that their first obligation is to Steve and to respect his wishes.[6]

\* \* \* \* \* \*

Now, your Honor, one other point: .... Steve said to me at one point, my feeling is that this was such a grievous, horrible murder, that there is nothing I could put in front of this jury that would make them have enough mercy on be to give me life rather than death, and in fact, begging for mercy in front of this jury may have an adverse effect. They may feel that because, after being found guilty of this crime, if I come in here and plead for mercy, that may turn them off, and make them want to give me death. They may think less of me as a man if I plead for mercy.

So as a strategic matter, there is the potential that he would be better off in getting a life sentence by saying to the jury, I have nothing to say. I will not ask—I will not put on mitigating circumstances, and I will allow you to make your decision on the evidence the State has put forward, and that because—that a jury may very well look at that and say, here is a man who has been found guilty and is not going to plead for mercy, and we respect him for that.

And then they may very well find that because it—at least there's some evidence that would indicate that he was not a real principal player in this that we tried to develop, that if anything, he was present or maybe initially involved in a small amount, but not as much as the other two,

**3.** Tr. at 10 (Feb. 26, 1993).

**4.** Tr. at 10–11 (Feb. 26, 1993).

**5.** Tr. at 11–12 (Feb. 26, 1993).

**6.** Tr. at 13 (Feb. 26, 1993).

that they may very well say, because of his involvement being somewhat lesser than the others, and because he didn't plead for mercy, we will respect him for that and give him a life sentence instead of the death sentence. That was the discussion that Steve and I have had. I hope I'm not saying something he doesn't want me to say because when you asked him that question, he didn't respond that way.

STEVEN SHELTON: That's pretty close.[7]

\* \* \* \* \* \*

STEVEN SHELTON: That was pretty close. I don't have the total recall of the exact conversation, but that's pretty close to our discussion.

THE COURT: Do you want to talk to Mr. Willard any more about your current thinking to represent yourself and present no mitigating evidence whatsoever? I'll give you that opportunity, if you would like it.

STEVEN SHELTON: Yes. Yes, I would. I would like to further discuss it with Mr. Willard.[8]

\* \* \* \* \* \*

MR. WILLARD: [After consultation]. My client's position has changed somewhat, your Honor. He wishes first to continue to represent himself at the penalty phase hearing. Secondly, he's asked that I call and have available to him those certain witnesses that I had mentioned to him who would be available for possible testimony as to mitigation. He will decide which of those he will call, if any of them, when his turn comes, and that will be determined on what goes before him.

Secondly, he asked that in my position of assisting him, that I be able to give closing argument to the jury and argue my position on—against the death penalty be-

cause he feels that I can do that better then he could. And he reserves, your Honor, most particularly and first and most importantly his right to allocution. He has indicated to me that he's prepared to take the stand and make a statement to the jury, with or without having called witnesses, and that he understands that he has a right to allocution without cross examination.

THE COURT: Well, if he takes the stand, he's not speaking in allocution as such. That will be a separate matter during which he cannot talk about the events of January 11, 12, 1992.

MR. WILLARD: Excuse me, your Honor.

THE COURT: He can't get into—if he's speaking in allocution, he cannot discuss the events of January 11 and 12, 1992.[9]

\* \* \* \* \* \*

MR. WILLARD: Your Honor, he understands that. He can't talk about any factual evidence. What he would intend to address them on is his life or his feelings about this matter, and that he believes and understands that if he does that and does not talk about any factual circumstances, that he can do that without cross examination.[10]

\* \* \* \* \* \*

THE COURT: [To Steven Shelton]. All I am saying is as far as your decision to want to represent yourself and present no evidence on behalf of yourself, do you understand that is probably a not smart decision?

STEVEN SHELTON: In whose point of view? That's not my point of view.

THE COURT: Do you understand that I may think it's not a smart decision on your part?

STEVEN SHELTON: Yes, I do.

---

7. Tr. at 14–15 (Feb. 26, 1993).

8. Tr. at 15–16 (Feb. 26, 1993).

9. Tr. at 55–57 (Feb. 26, 1993).

10. Tr. at 57 (Feb. 26, 1993).

THE COURT: Do you understand that it is always more dangerous to represent one's self?

STEVEN SHELTON: I understand that.

THE COURT: I am going to ask this, even though I asked you awhile ago. If I permit you to represent yourself and you choose on your own not to present any mitigating evidence, do you understand that that decision, my decision and your decision are ones that you make be stuck with on appeal, on any post-conviction remedy or at any other time?

STEVEN SHELTON: Yes, I do.

THE COURT: When I say stuck with it, you may not be able to come back—you will not be able to come back or may not be able to come back and say the Judge shouldn't have allowed me to do that. Do you understand?

STEVEN SHELTON: Yes.

THE COURT: Do you understand that?

STEVEN SHELTON: I understand that. My decision is based on the either life or death situation. I hold true to that.

THE COURT: Do you understand that as far as presenting reasons to the jury why you should get a recommendation of a life sentence and why I should impose a life sentence, that Mr. Willard, no disrespect to you, Mr. Willard as a trained, very experienced and very competent lawyer who has had many cases in this court, would be better able to present that to the jury and to me than you would?

STEVEN SHELTON: Yes.

THE COURT: And you accept that risk even though it means the death penalty?

STEVEN SHELTON: Yes, I do.

THE COURT: Or the possibility of the death penalty.

STEVEN SHELTON: That's correct.

THE COURT: And you understand that Mr. Willard, as I was trying to say not too well a moment ago, is a lawyer and it's his job to believe in your case and to present the case as a professional, and he doesn't have—he doesn't become emotional like the person—like yourself. Do your understand that?

STEVEN SHELTON: Yes, I understand that.[11]

* * * * * *

THE COURT: As a lawyer, as a professional, since he's not representing himself, but since he's here to represent you to the best extent he can, he is better able to present the evidence on your behalf or point out to the jury any weaknesses in the State's case. Do you understand that?

STEVEN SHELTON: Yes.[12]

* * * * * *

THE COURT: All right, Mr. Shelton, I am going to grant your request, not the amended one. I will allow you to represent yourself. . . . [13] I am fully satisfied that you understand the risks of what you are doing, that you fully understand that by representing yourself, you are not doing the best thing, rather than having your lawyer representing you, even though you may believe you may be able to get your family members to come in and say things, if you ask them, rather than Mr. Willard.

STEVEN SHELTON: Yes.

THE COURT: But that still—I understand and appreciate that you understand and appreciate that that still could hurt you in the presence of the jury, correct?

STEVEN SHELTON: Yes, I do.

THE COURT: [Y]ou will be able to freely consult with him as stand-by counsel when we resume these proceedings next week about any matter . . . .

11. Tr. at 74–77 (Feb. 26, 1993).

12. Tr. at 77 (Feb. 26, 1993).

13. Tr. at 88 (Feb. 26, 1993).

You are—you have an eleventh grade education, 27 years old. You are not—you have—and I don't say this disparagingly, but it's part of the decision I have to make in terms of whether your decision to do this is knowing, intelligent and voluntary. You are experienced in the criminal justice system.... And you have, after two days of further talking to your family about it and Mr. Willard, you have repeated the decision, except with the one thing about Mr. Willard being able to speak to the jury on your behalf, which I cannot allow.... As I said, however, that does not prohibit you from first consulting at any time with Mr. Willard about what you might want to do, any questions you might want to ask, or about any other matter or anything else during the course of these proceedings. Do you understand that?

STEVEN SHELTON: Yes.

THE COURT: Further, it does not prevent you in any way from speaking to the jury in allocution and to me. Do you understand that?

STEVEN SHELTON: Allocution, I don't—

THE COURT: Allocution is a very technical word, speaking to the jury on your own behalf. I apologize for using the word that [even] most lawyers don't know. Allocution is a very legalistic way for asking the sentencing authority, whether it's a jury or jury, to give you mercy, spare your life in this case, and sentence you to life. That's what it really means, to explain your humanity, you know.

STEVEN SHELTON: I understand.

THE COURT: Whether you want to—you can't argue about the facts. You can talk about yourself, your background, your upbringing, your education, your folks at home, any alcohol abuse problems, things like that. You can talk about all those things as much as you want. You just

can't talk about the facts surrounding the murder. Do you understand that?

STEVEN SHELTON: Yes.

THE COURT: And I find that you do understand that, and that that is part of the decision that you have made, that you think that you might do that. You understand that you have a right to do that to me and to the jury.

STEVEN SHELTON: Yes, I do.[14]

**Allocution Statement of Steven Shelton Pages 62–63**
**Transcript of Penalty Phase Proceedings**
**March 3, 1993**
**Jerome O. Herlihy, J.**

\* \* \* \* \* \*

STEVEN SHELTON: Ladies and gentlemen of the jury, I stand before you not to plead for my life. I feel that's wrong an improper and basically disrespectful to the victim's family and to mine.

The State has painted a picture, and that picture is not very pretty, pertaining to me and my co-defendants. And I would just like to present to the jury a different side or a different meaning to Steven Shelton.

The State has pictured me as being a monster, as being a rapist, as being a violent individual, but as you heard from my family, that's not so. The State only presents one side of the picture. There's two sides to every story. And the State just presents the negative side.

The jury has found me guilty of these allegations, and now it's the jury's turn to render a verdict. And that verdict is either life in jail or death. Again, I'm not here to plead for my life, but just ask the jury to be fair in their decisions.

That's all I have to say.[15]

---

**14.** Tr. at 90–94 (Feb. 26, 1993).

**15.** Tr. at 62–63 (Mar. 3, 1993).

## APPENDIX B

### Memorandum Opinion at 88–94
### December 22, 1997
### Jerome O. Herlihy, J.

*Allocution*

Steven argues that this Court impermissibly restricted his right to speak in allocution. . . .

These claims arise initially out of a colloquy involving this Court, Steven's trial counsel and Steven. As noted earlier,[74] Steven initially wanted to represent himself during the penalty hearing. After several days, he changed his mind and wanted trial counsel to remain, but with certain conditions.

When the Court was discussing with trial counsel and Steven his initial decision to represent himself, his counsel indicated that Steven told him the killing was so horrible, nothing he could tell the jury would engender enough mercy to recommend life over death. Steven told his lawyer that begging for mercy would have an adverse [effect]; that is, make it more likely death would be recommended. His counsel and Steven discussed Steven's thought that if he said nothing, Steven would have a better chance of a life recommendation.

Trial counsel went on to say that because there was some evidence that Steven was not as culpable as Nelson and Outten, the jury would find it more appropriate to recommend life, particularly if he did not plead for mercy. All of this was related to the Court by Steven's counsel as Steven's thinking. Steven directly acknowledged to the Court that this was his thinking.

Later in the same proceeding, trial counsel informed the Court that Steven still wanted to represent himself but wanted certain assistance from counsel. As part of that self-representation, trial counsel said Steven reserved the right to speak in allocution. Counsel said Steven was prepared to take the stand and that he had a right to speak without cross-examination.

This latter comment prompted the Court to say that if Steven took the stand, he is not speaking in allocution. But it was noted that if he spoke in allocution, he was told he could not discuss the events surrounding the murder.[75] Trial counsel replied that Steven understood that limitation. Counsel said Steven would speak of his life, his feelings about this matter and that he would do so without discussing the circumstances of the murder. All of this, counsel said, would be without cross-examination. Even later in the same proceeding, the Court reviewed with Steven directly that in allocution he could not present facts regarding the murder.

The procedure for a penalty hearing is set up by statute:

> At the hearing, evidence may be presented as to any matter that the Court deems relevant and admissible to the penalty to be imposed.[76]

*　　*　　*　　*　　*　　*

This Court readily acknowledges (then as now) the admonition of *Lockett v. Ohio*[77] and *Eddings v. Oklahoma*[78] that there can be [no] [amended by letter] restrictions placed on the presentation of mitigating *evidence*. This Court's instruction in no way placed any restrictions on the mitigating evidence Steven could present.

Steven clearly understood what was going on and what he wanted to do. That is, he clearly realized the risk to him of cross-

74. [footnote omitted].

75. This admonition is routinely given in single or multiple defendant capital cases under the circumstances.

76. 11 *Del. C.* § 4209(c).

77. 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

78. 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

examination and wanted to avoid having to undergo it. There is a strong suggestion, however, that by way of "allocution," Steven wanted to present his version of the events and to do so without the State being able to ask him questions. Yet, as his lawyer acknowledged, there was "some" evidence during the guilt phase from which he could *argue* that his involvement was less than Nelson and Outten. There never was a restriction of any kind in arguing from that which was already in *evidence.* The Court concurs there was evidence on which such an argument could have been made. Such an argument would not have violated the Court's parameters on speaking in allocution.

The Court cannot agree with what appears to be the State's argument on this claim. The State seems to argue that the provision in § 4209(c)(2) which enables defense counsel *and* the defendant to present argument covers the defendant's right to speak in allocution.

The Delaware Supreme Court has never had to address that contention. Clearly, the statutory right of both counsel and the defendant to present argument avoids the flawed capital sentencing statutes which meant only one or the other could present argument.[79] Further, allocution is not argument.[80]

Superior Court Criminal Rule 32(a)(1)(C) requires this Court to afford a defendant an opportunity to speak in allocution. Such a requirement has been recognized in decisional law.[81] But this Court did not prevent Steven from speaking in allocution nor did it limit the information he could mention to the jury. As noted, there was no limitation on the mitigating evidence he could present.

In short, therefore, the Court did not err in placing parameters on the allocution Steven wanted or did make to the jury. Since there was no legal error, counsel did not breach any standard of professional conduct.

\* \* \* \* \* \*

What Steven said to the jury was consistent with what his lawyer and he told the Court outside the jury's presence was the manner he wanted to present his case during the penalty hearing. He felt he could not ask for mercy after the jury had found him guilty of a heinous murder. To do so, he acknowledged, would risk offending the jury and prompting a greater likelihood of a death sentence recommendation. Steven had indicated to his trial counsel and the Court that this would be his approach *prior* to the Court indicating the parameters of allocution. Thus, those parameters in no way affected his talk to the jury.

That observation is underscored by the lack of any indication of what he would have said, if no parameters existed. To put it another way, Steven cannot demonstrate actual prejudice. He does not say what he would have said nor does he show how that as-yet, unarticulated allocution would probably have caused more votes recommending a life sentence. Even in allocution, he could have properly referred to the trial *evidence* pointing to his lack of involvement and not violated the Court's parameters.

The jury was fully aware of the defense he had vigorously undertaken, namely, his limited role. The jury, obviously, found against him on that defense. It heard evidence of threats and possible [subornation] of perjury. Better than most, perhaps, Steven fully appreciated the risk to him of challenging the jury's verdict to its face and seeking to reinvoke a defense it had so clearly rejected.

---

79. *See Harris v. State,* 306 Md. 344, 509 A.2d 120, 124 (1986).

80. *Id.*

81. *See Hooks v. State,* Del.Supr., 429 A.2d 1312, 1313–14 (1981); *accord Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961).

Finally, Steven's argument appears to be that, if the Court had not placed any limitation on his allocution, he would have told the jury he was uninvolved, was off in the bushes when Mannon was beaten and never hit him. He does not say now that is what he would have said so this claim rings a bit hollow. It rings hollow also because to say *now* he would have said that flies in the face of his decision not to beg for mercy or offend the jury by rearguing its verdict.

In short, therefore, Steven cannot meet the prejudice test under *Strickland/Albury.* Nor can he show that the proceeding was fundamentally unreliable or unfair or defective. Accordingly, this claim of ineffectiveness cannot stand.[84]

84. *Grace [v. State,* Del.Supr., 682 A.2d 626 (1996), Order at ¶ 7].